## DISNEY BROS. v. CAMPBELL COUNTY, et al.

Eastern Section.  January 9, 1926.

No petition for Certiorari was filed.

1. **Contracts. Evidence. Evidence held to show contract made for benefit of a third party.**
   In a contract to recover for provisions furnished to a subcontractor, the evidence set out and held sufficient to show that the general contractor had contracted to pay for the provisions and that they were sold for his benefit.

2. **Frauds, statute of. Contract to pay for provisions furnished a subcontractor, held not within the statute of frauds requiring the contract to be in writing.**
   Where a general contractor promised to pay for goods furnished a subcontractor and it was shown that he actually received the benefit from the contract in that he was enabled to finish his contract on time, held that the contract did not come within the statute of frauds and need not be in writing.

3. **Contract. Provisions of contract of general contractor for building a road held to secure merchant furnishing goods to a subcontractor.**
   Where a contract of a general contractor provided that the contractor should pay all bills of subcontractors and hold the commissioners harmless, held that this contract was for the benefit of merchants furnishing supplies to a subcontractor and the general contractor was liable under his contract for such bills.

4. **Contracts. In Tennessee a beneficiary though not a party to the contract may maintain an action in his own name against the promisor.**
   In Tennessee the doctrine is firmly established that the beneficiary, though not a party to the contract, may maintain an action directly in his own name against the promisor, where such promise between the promisor and the promisee is made upon consideration for the benefit of the third party.

Appeal from Chancery Court, Campbell County; Hon. Hal E. Portrum, Chancellor.

Reversed and judgment here.

E. H. Powers and A. J. Agee, of Jacksboro, for appellant.

Green, Webb & Tate, of Knoxville, for appellee.

SNODGRASS, J. This bill was filed to collect an account of $987.47, finally reduced to $598.02, against the defendants Donivan, Doughty & Taylor, the firm of contractors named in the caption. Campbell county and its commissioners and chief engineer were made parties in order to attach and impound certain alleged funds of the defendant contractors retained in their hands as one of the means of securing the performance of a certain pike contract let by the commissioners of said county under a written contract to the said defendant contractors, and to enjoin the county from paying over said fund to the said contractors.

An attachment and injunction issued in conformity with the prayer thereof, but later the funds were released from the attachment, and the injunction was dissolved upon proper bonds in amount sufficient to have secured any judgment that complainants might have obtained. However, in the final decree it was stated that no judgment was sought against the defendant Daniels, and that theretofore the cause had been dismissed against the county and its engineer and commissioners, and hence there is nothing in this cause to determine except the question of liability of the defendant contractors to the complainants for the alleged account.

Proof was taken and the cause came on to be heard before the Chancellor upon the record and proof, from all of which it is stated in the final decree that the complainants, Disney Bros., have not by a preponderance of the evidence made out a case against the defendants, Donivan, Doughty & Taylor, and it was accordingly adjudged that the bill be dismissed, and that Donivan, Doughty & Taylor recover of complainants, Disney Bros. and their security all the costs of the cause.

From this decree the complainants prayed, obtained and perfected an appeal to this court, and have assigned errors as follows:

1. "The court below erred in dismissing complainants' bill and in taxing them with the costs of the cause."

2. "It is stated that the main issue relied on by the defendants was the defense raised in the statute against frauds and perjuries, and complainants presumed, in the absence of any specific holding of the Chancellor's decree dismissing complainants' bill and taxing them with the costs of the cause, under the idea that the debt sued on was the debt of another and barred by the statute of frauds and perjuries, and this holding is assigned as error."

The facts are that the defendants, the firm contractors, as they will be hereinafter called, entered into a written contract with the said commissioners to build a certain pike road in campbell county, which was to be built according to the terms of the contract under the direction of the defendant engineer, which the contract gave very nearly autocratic power in his supervision of the building of the pike.

As will appear from the contract, which is filed as Exhibit No. "1" to the original bill, the road was to be finished within a certain time, which was of the essence of the contract. The defendant contracting firm was somewhat pressed for time, and they sublet a portion of the building of this pike to defendant Daniels. They knew that he was not financially able to finance his contract and without help did not have the credit to carry it on alone, but he seems to have had an outfit of teams and tools, and the defendant firm contractors were willing, as stated, to let a portion of the said contract to the said Daniels, which they did. The complainants furnished the supplies sued for to said Daniels, in payment of his laborers and for other supplies necessary in the prosecution of his work. These supplies were necessarily and properly consumed in the prosecution of said work, and became an account thus properly chargeable as liabilities incurred by the said Daniels as a subcontractor and builder, if the said contracting firm is not liable for such supplies.

The answer practically admitted that the items were correct, but disclaimed any liability therefor. The account was originally claimed in the bill to have been $987.47, but it is conceded by the complainants that the amounts charged in January, February and March should be charged to Daniels alone, and that the remainder of the sum should be credited with $160 paid by defendant firm, which would reduce the claim to $598.02.

The learned Chancellor did not enter into any details as to his reasons for his conclusions, simply stating, as before indicated, that the complainants had failed to make out any case against the defendant. From an examination of the record we are unable to concur in this opinion. In the first place, we are of the opinion that the weight of the proof is that while as a matter of law the defendant Daniels was liable for the goods so furnished, nevertheless the primary credit was extended to the defendants, the contracting firm, as without their promise to pay for these supplies they would not have been furnished. The arrangement for the payment for these supplies was made between Mr. Disney, one of the partners of the merchant firm and Mr. Taylor, a partner of the contracting firm. Before Mr. Daniels was let have any of these goods he applied to Disney Bros., but they declined to allow him any credit until they had seen Mr. Taylor. Mr. Disney did see Mr. Taylor in regard to the matter, and testifies:

"Q. In regard to that arrangement, state what Mr. Taylor said to you. A. Well, he said—I spoke to him down by the

pike; he got out of a car, and he said for us to furnish them some stuff, and that he would take care of us. Bob Daniels had been to see me and wanted some stuff, but he had owed me some for over a year, and I would not let him have anything.''

"Q. Did you let him have anything until Mr. Taylor said he would make it good? A. No, sir, I went on back down there and told Mr. Foster the arrangements, and told him we would let him have the stuff.''

Mr. Foster is the other partner that composes the firm of Disney Bros. He was likewise acquainted with the financial standing of Daniels, and would not have furnished him the goods on his credit. This arrangement was made before any goods were furnished. It is true Mr. Taylor denies this arrangement, and while he admits that Mr. Disney did come to see him, he says he showed him where Daniels was going to make some money out of his contract, and that Mr. Daniels had assured him he could do it, only he would need some help about some feed which Mr. Taylor had promised to help him along occasionally. He says he told Mr. Disney on that occasion not to charge anything to his firm, but if there was any way in which he could protect Mr. Disney without getting his firm into trouble— "But I cautioned him." . I said, "Mr. Disney, I have told Mr. Donivan and everybody else since I came to Campbell county not to charge anything to Donivan or me, or our personal instructions to charge.'' That Mr. Disney said he had known Mr. Daniels for some time, and he thought Bob was all right; that he thought he was honest, and a good straight man, Mr. Taylor denied that he had made such contract, and that he had cautioned Mr. Disney at that time and later not to sell anybody anything at the store up there without the say so of the firm or a written order, because he had lost money before on that kind of business methods; that he had not known much about Daniels, but for some cause Mr. Doughty had not a very good opinion of Mr. Daniels, and had warned him, and he states that that was in his mind when he had warned Mr. Disney; that it made him so very particular and careful; that Mr. Disney never asked him to secure it; that he never asked him "Can we charge it to you?" That in the run of the conversation he said: "I had warned him and told him not to sell anybody anything; that was not for Mr. Disney's benefit, but it was in a general way, because we did not allow anybody to buy anything without one or the other of us bought or gave a written order. You will find it that way in Jacksboro and everywhere else we have been.''

It will thus be seen that the issue of veracity between Mr. Disney and Mr. Taylor cannot be reconciled. There was no one else present when the alleged agreement was had. Mr. Taylor thus argumentatively bolsters his statement, and Mr. Doughty does say that after he learned of the sub-letting to Daniels he had said to Mr. Taylor

over the 'phone: "You had better be careful, or Mr. Daniels will beat you!" To which he is alleged to have replied: "How can he beat me, I am just subbing to him." Well, I said, "I can't tell you now," but I said, "before it's over, why I can." Mr. Doughty was then asked:

> "Q. What did you mean by that? That you did not know how, but there would be a way? A. Yes, he always beat everybody, and I meant he would get him before he got through."

There is added to this an argument that this particular account was never presented, and that the Winfrey account and the personal account of the defendant contracting firm had been presented; that the account was charged to Daniels, and that Mr. Winfrey had heard Mr. Foster say that they were looking to Daniels. This matter of charge account to Daniels was explained, that there was a personal account of the firm contractors, a Winfrey and a Daniels account carried with the complainants about the same time, carried in these names to keep them separate and prevent confusion. This account started out on Exhibit No. 2, yellow back book with "Pike Work for D. Doughty & Taylor," followed by "R. A. Daniels," but it was argued from the fact that R. A. Daniels is on the first line, that the "D. Doughty & Taylor" was added as an afterthought, and that the bookkeeper, Mr. Foster, never presented any account for these articles to Mr. Taylor's firm.

These accounts were kept under the cash register system, and were mainly on slips, but Mr. Foster testifies that Mr. Disney called upon Mr. Taylor for pay, and that they would put him off; that that was what Mr. Disney said.

This evidence was objected to, though not ruled on by the court. It is, however, a circumstance to be considered against the inference sought to be drawn from the alleged failure to render a statement, and besides the account seems only to have run two months before Mr. Disney was notified to stop selling Mr. Daniels anything on their account; which specific instruction, significant if true, was denied by Mr. Taylor in general terms as stated before.

Mr. Foster also testified that Mr. Taylor had been in the store and had gone over the accounts, and that he never disputed any of the accounts before the completion of the work. He also states that about the time the work was finished Mr. Taylor notified him not to pay any more.

Regarding this fact Mr. Disney also testified that sometime along about the 1st of January, and later corrected as the 23rd of December, Mr. Taylor told them not to let them (meaning Daniels) have anything else, that he would not stand for it; but that Daniels executed a mortgage, and they continued to let him have goods after that in January, February and March. Mr. Disney denies that Mr. Taylor had ever cautioned him, or that he said in the conversation

he had told Donivan and everybody else not to charge anything to
Donivan, Doughty & Taylor without a written order, or that he in-
quired of Daniels' prospects for making money.  He said he had
sent Taylor statements of account, and Taylor had promised frequ-
ently to pay it, and that he never denied the account until the work
was about finished.  He was asked:

"Q.  When was it that Mr. Taylor first intimated he would
not pay the Daniels account, and what, if you know, gave rise
to his unwillingness to pay it?  A.  Sometime after he had in-
structed us not to let Daniels have anything more on Donivan,
Doughty & Taylor, he asked me if I had agreed to furnish
Daniels supplies, and I told him that Daniels had given us a chat-
tel mortgage on some things to help him complete the job.  He
then flew mad and said that he would beat us out of the whole
thing.  This was the first time he had ever expressed an un-
willingness to pay the Daniels account."

Mr. Disney also testified that he had been after Mr. Taylor to pay
this account, and that Mr. Taylor said he would pay it when he got
estimates.  He was waiting on the surveyors.

It was also shown that on pay days, or at least one, Mr. Taylor
had a list of the laborers that had been paid off by Disney Bros., or
had taken up part of their account with them, and this amount so
paid by the complainants was deducted from the account.  In addi-
tion to this it was shown that Mr. Winfrey, one of the parties who
testified for the defendant, had an independent contract with the
firm contractors for the concrete work on the same road that Daniels
had the contract for grading, and that as to Winfrey Disney Bros.
had the same sort of contract as that claimed by them for Daniels,
and that the complainants furnished to the said Winfrey supplies,
and these supplies were paid for by the defendant firm without any
question.  This the firm admits, but they say they knew Winfrey and
was willing to trust him.

As to his employment, Mr. Daniels testifies as follows:

"Q.  Mr. Daniels, state whether or not you, at the time you
began work there, was able to perfect a contract of constructing
that road individually, by yourself?  A.  No, sir."

"Q.  State whether or not you made known to Donivan,
Doughty & Taylor that you were not able to?  A.  I told Mr.
Taylor over the 'phone before I saw him that I was buying feed
on credit, and he says: 'That don't matter, my credit is as good
as gold,' and he says: 'Hold on a minute, there is nothing as
good as gold, I will take that back,' and he told me to meet him
next morning, that it would be all right."

"Q.  Mr. Daniels, state what arrangements if any Donivan,
Doughty & Taylor made with Disney Bros., by which they were
to furnish the men working on your end of the job materials,

. etc.   A.   He never had any talk to me about it, only one morn-
ing Mr. Taylor was coming from the upper place, and he asked
me if I got my produce, and I told him I could get it from Dis-
ney, and he said that was all right.   He said Mr. Disney had
agreed to take care of us.   That was the way I understood it."
This was about the second or third day of the work.

The inherent probabilities of the story, as well as the corroboration,
we think are with the complainants' contention.   Here were responsi-
ble men, who had a big contract on hand that it was important to fin-
ish on time.   They sublet to two men a section; one of them was to do
the grading, and the other the concrete work.   Neither of these men
could give, or did give, any bond.   Neither could do the work with-
out financial help and backing.   To enable them to carry out the
contract it was essential that they have credit.   The preponderance of
the proof shows that Daniels applied to Disney for credit, and could
not get it; that he had owed Disney an account of long standing, and
they were unwilling to trust their goods to his credit.   Mr. Disney
left the store with the express purpose of seeing Mr. Taylor as to
whether Donivan, Doughty & Taylor would be responsible for the
supplies.   It is admitted that he saw Taylor and had a discussion
with him, but Mr. Taylor argues that he convinced Mr. Disney of the
respsonsibility of Daniels, and that he went away without even ask-
ing him if he could charge the goods to him, or if he would be re-
sponsible.   This Mr. Disney denies, as already shown, and states
what he said did occur.   Mr. Foster states that when Mr. Disney
returned to the store he said that he had made the arrangements with
Taylor, and they were to furnish Daniels stuff.   Corroborative of this
also is the statement heretofore set out of Daniels, when Taylor told
him that Disney had agreed to take care of us.

It was just as important and just as necessary that the defendants
furnish aid to Daniels as it was to furnish aid to Winfrey, and as
much desirable on the part of complainants to have them stand for
Daniels as for Winfrey, and if Mr. Taylor had not made the agree-
ment which Disney claims, there was no reason why Disney upon
his return to the store should have stated to his partner that he had
made such arrangments.   This was at a time when no credit had
been extended to Daniels at all, and unless it be considered that this
whole transaction was an after-construed conspiracy between Dis-
ney, Foster and Daniels to foist this account upon the defendants,
it is more reasonable and more in conformity with the necessities of
the occasion to conclude that it occurred just as complainants say it
did.   And, too, while Mr. Taylor now claims that he never under-
stood they were looking to him for any part of the account until
the bringing of this suit.   Disney and Foster both testify to the con-
trary.   They say that Taylor notified them not to charge anything

more to them about the latter part of December, when they got a mortgage from Daniels on his stuff and continued to let him have goods, but looked to him after that for the pay; which fact, according to Disney, angered Mr. Taylor and provoked him into the expression that he would beat him out of his account.

The defendant contractors claim that they knew Winfrey and was willing to trust him, as stated, but their contract with the commissioners obliged them in any event to give their personal supervision over all the work. This they could not delegate. They carried on a portion of the work themselves just adjoining. They had the situation and the security within their own hands, which eliminated to a great extent the danger of employing Daniels and, therefore, any particular reason to distrust him. He had some teams and an outfit, and was willing and wanted to go to work, and the credit of the contracting firm was as good as gold. These supply advancements were at hand upon this credit, and they had to be had from somebody. It was important that the work proceed and be finished upon time, or large forfeitures was the consequence, and, therefore, a sufficient reason for aiding him.

It appears also that they knew these supplies were being furnished, and these payments made to laborers on works resulting to their benefit; and finally, the instructing of complainants to charge no more to their account, all this we think gives the greater weight to the proof that the firm contractors did agree to be responsible for these supplies, and that there was a substantial consideration therefor. The benefit to the contractors was in getting the work done on time. The credit was extended to the firm contractors rather than to said Daniels, and the promise therefore was not within the statute of frauds.

It is insisted in the brief that it was admitted by Mr. Foster that they were not looking to Donivan, Doughty & Taylor to pay the claim; that this fact stands proven because Mr. Foster did not go back upon the stand after this statement was made by Taylor and Winfrey. This statement has been referred to heretofore, and it is believed that if such statement was made at all, having been made after the mortgage was executed by Daniels that it was with reference to the account secured by the mortgage. It was not admitted by Foster that they were looking to Daniels, and though he did not go back upon the stand after the statements of Taylor and Winfrey in this regard, his evidence in effect had already denied it.

The case of Anderson v. Milton, 4 Yer., 576, is different from the case at bar. While that case does seem to hold that if there is any liability of the person to whom goods were furnished the promise would be within the statute, yet there was no consideration passed to the promisor, as we think there was in this case. The mere fact, as stated, that Daniels may have been liable to the complainants for

goods furnished to his use, and a liability thereby created, should not be allowed to negative the idea that the sole credit given was upon the promise to be responsible.

And further upon this subject, regarding the insistence that it had been admitted by Mr. Foster that they were looking to Daniels for this account, and that this statement was made in the presence of Mr. Winfrey, Mr. Taylor places this conversation somewhere about the middle of January, while Mr. Winfrey places it in February, or even after Daniels had quit work, for he says: "Mr. Foster said that Daniels was doing some railroad work for the Southern Railroad, and Mr. Disney was looking after the same, and thought possibly that they could clear enough money on the railroad job to square Daniels' account." Mr. Taylor says that they were in this conversation discussing "what I thought about the possibility of him getting a mortgage on the Daniels outfit to help secure it," and that he again warned him not to look to Donivan, Doughty & Taylor.

It is the habit of Mr. Taylor in his testimony to argue the question and to introduce at times somewhat irrelevantly this question of warning, but as to this statement it may be observed that the mortgage, on the outfit had already been obtained, and as early as December 23rd, about which time Mr. Disney said Mr. Taylor had told them not to let Mr. Daniels have any more. Mr. Foster also says they were notified not to let Mr. Daniels have any more stuff, and they say that after the mortgage they were not looking to the contracting firm for anything except supplies furnished in November and December, the period not covered by the mortgage.

Upon the whole we think that the goods for November and December were sold upon the credit of the firm contractors alone, and not upon the strength of any credit to Daniels. It is true, as stated, that Daniels might have been liable upon the idea of goods received to his use, but this fact alone does not avail to establish that the credit was extended to him; and being charged to him, or under his name, was merely to prevent confusion of the three accounts.

We think, therefore, that the case would fall within the provisions of Hazen v. Bearden, 4 Sneed, 10, where the goods were sold and delivered to Morgan at the request of Hazen, and credit was given to Hazen, and he was held liable, although the account was kept against Morgan, because he requested that the goods should be sold and delivered, and promised to pay for them, and the credit was given to him. This made it Hazen's debt, and the similar conditions in the case at bar made it the debt of the firm contractors.

Of course, as said in the case of Murphy v. Renkert, 12 Heisk., 397, if the credit was not extended alone to the defendant firm contractors, and if it had been given in whole or in part to Daniels, then it would have fallen within the statute, even though there may have been property of Daniels in the hands of said firm out of which they

6 T. A.—37.

might have satisfied such promise, and out of which they may have even promised to pay it. A promise to pay out of a particular fund is not superior to a promise to pay generally, which could be satisfied out of any fund.

While the case of Murphy v. Renkert was properly reversed for errors of the court in its charge, that "if the defendant Murphy had in his possession or under his control effects of the real purchaser or purchasers from said Renkert, which effects Murphy had the power to apply to the payment of said debt, then his promise to pay the debt would bind him, though not reduced to writing, "one of the cases referred to as supporting this case, that of Campbell v. Findley, 3 Humph., 247, has since been reversed, upon the idea that a promise such as made in the case of Campbell v. Findley is in payment of one's own debt, supported by a sufficient consideration. Moore & Miller v. Stovall, 2 Lea, 555.

In such a case it could make no difference that the person for whose debt the promise was made continued still liable.

The other case referred to in Murphy v. Renkert is that of Mills v. Mills, 3 Head, 711, which holds: "Where the promise arises out of some new consideration of benefit or harm moving between the newly contracting parties, the case is not within the statute, the benefit on the part or the harm on the other constituting a sufficient consideration to support the promise."

Certainly it seems that the defendant firm contractors was receiving a benefit by the completion of the road. Their contract with the road commissioners obliged them to pay the debts of subcontractors, and especially that of laborers, it being recited in the contract, which is filed as Exhibit No. "1" to the original bill, that "The contractor further binds himself not to keep or suffer to be kept or used any ardent spirits in any house or tenement built or occupied by him, or his workmen, or boarding house keepers under him, on or near said road, and to discharge from his employment any workman, laborer, or boarding house keeper who is guilty of a breach of this regulation, when required by the engineer, and to promote good order among laborers upon the work embraced by this contract, by giving them assurance of the full payment of their wages."

These advancements to laborers, and also, it is thought, the furnishing of other necessary supplies by the complainants, resulted in a benefit to the promisors which support the promise as a consideration, should itself take it out of the statute of frauds. Besides, in addition to the foregoing, there is another phase of this matter which it is thought under the authorities makes the defendant contractors liable. In their contract with the said commissioners, which by reference is made a part of the contract of the defendant contractors with Daniels, is this provision, which immediately follows the one above quoted:

"The contractor agrees to pay and to hold the commissioners harmless from:

"(a) All debts or dues, or demands or claims against the contractor, or of or against any subcontractor, for services and labor performed, or materials furnished in said work, for provisions and supplies, board of the men and teams engaged in said work, and of all debts, dues, demands or claims growing out of said work, whether like or unlike those enumerated."

This contract is made a part of the contract of the defendant contractors with Daniels in the following reference:

"Now first party have contracted with Campbell county Pike Commission to do this work, as evidenced by a contract and specifications, a copy of which are hereby attached and becomes a part of this contract."

This latter contract with Daniels is filed as Exhibit "A" to his deposition, on page 52 of the record.

We do not think these provisions, in view of the entire contract and its express terms, amount simply to an agreement to hold the commission harmless against such debts. It does that, all right, but it does more than that. It is an express undertaking to pay such debts, as well as to hold such Commissioners harmless. This without reference to any statute which might have required a certain procedure to fix a lien, thus perfecting an indirect obligation against the county or the commissioners, but we think these provisions fix a direct liability to beneficiaries as part of the original contract, being a promise made or enuring to their benefit, and their privity therewith is established by acceptance, which may be evidenced by their bringing suit. Ruohs v. Insurance Co., 111 Tenn., 405.

This latter case cited as one of the authorities sustaining it the case of Moore & Miller v. Stovall, 2 Lea, 555, which overrules the case of Campbell v. Findley, 3 Humph., 247, and as also sustaining the principle announced, County v. Railroad, 14 Lea, 525; McCarty v. Blevins, 5 Yer., 196, 26 Am. Dec., 262; O'Conner v. O'Conner, 88 Tenn., 76, 12 S. W., 447, 7 L. R. A., 33; Thompson v. Thompson, 3 Lea, 126; Mills v. Mills, 3 Head, 711; Railroad v. Houston, 85 Tenn., 224, 2 S. W., 36. The principle is as follows:

"In Tennessee the doctrine is firmly established that the beneficiary, though not a party to the contract, may maintain an action directly in his own name against the promisor, where such promise between the promisor and the promisee is made upon consideration for the benefit of the third party."

Without elaborating further we think there is a just liability in the sum of $598.02 against the defendant firm contractors for that portion of the account sued on for November and December. They got the benefit of the complainants' stuff; they agreed they would

pay for it, both to the commissioners and to the complainants, and the equities of the case are reached in this conclusion.

The assignments of error are sustained. The Chancellor's decree dismissing the bill is reversed, and a judgment will be entered here against the defendants, Donivan, Doughty & Taylor for the said sum of $598.02, with interest from the filing of the bill.

Thompson, J., concurs.

Portrum, J., did not participate in the disposition of the case.