**Joseph A. RYAN and Eugene A. Pearsall, Individually and as Partners, d/b/a Quince Pharmacy, a Partnership, Plaintiffs-Appellees,**

v.

**STANGER INVESTMENT COMPANY, a Tennessee Corporation; Quince Station Shopping Center, a Tennessee Limited Partnership, and G. Dan Poag, Jr., Defendants-Appellants.**

Court of Appeals of Tennessee,
Western Section.

May 1, 1981.

Application for Permission to Appeal Denied by Supreme Court Aug. 24, 1981.

George E. Morrow, Memphis, for defendants-appellants.

R. Grattan Brown, Jr., William Thomas Newton, Memphis, for plaintiffs-appellees.

NEARN, Judge.

This Chancery suit was brought to require defendant to specifically perform an agreement to lease.

To properly understand the issues, we must first set forth a substantial portion of the pertinent facts.

Plaintiff, Quince Pharmacy, is a partnership with its business site located in the Quince Station Shopping Center in Memphis. Quince Pharmacy leased these premises from the owner of the shopping center, Stanger Investment Corporation. The pharmacy's original lease was for twenty years and scheduled to expire on May 31, 1980. The principal owner and officer of the Stanger Investment Corporation was Stanley Molasky. In December, 1976, Molasky sold all of the stock of the corporation

to G. Dan Poag, Jr., who is now the owner of Quince Shopping Center and the real defendant in this case.

At the inception of the lease, the members of the Quince Pharmacy partnership were Joseph A. Ryan, a pharmacist, and Carlton B. Hudson, a silent partner. In October of 1975 Ryan and Eugene A. Pearsall, III, also a pharmacist who was then working for Ryan, had discussions regarding forming a partnership whereby Pearsall would buy out the interest of Hudson. Pearsall was interested in forming the partnership, but was greatly concerned about the short period then remaining on the Quince lease. Pearsall agreed with Ryan to form the partnership if an agreement with the owner (then Molasky) could be had on the terms of a new lease to become effective at the expiration of the old lease.

Therefore, Ryan and Pearsall contacted Albert Emry, Jr., of Hobson-Kerns, Inc., the rental agent for the owner, Molasky, concerning a new lease at the expiration of the old. Emry was advised of the contemplated partnership change. Emry agreed to meet Ryan and Pearsall at Ryan's home to discuss the matter. Prior to this meeting, Emry contacted Molasky to notify him of the situation and circumstances and to clarify his, Emry's, scope of authority in the matter. Molasky advised Emry of his terms for a new lease and of Emry's authority. On November 4, 1975, Emry, Ryan and Pearsall met. Ryan and Pearsall agreed to Molasky's terms, but requested that two other items or terms be included in the lease. Emry advised them that it was not within the scope of his authority to bind his principal on these items. He told Ryan and Pearsall that he would have to first clear those items with Molasky, but he would contact them as soon as he could see Molasky.

The terms upon which Emry could bind Molasky, and which were agreeable to Ryan and Pearsall, were basically the first four items listed in the following letter. Items No. 5 and No. 6, below, are the two additional terms which Ryan and Pearsall desired in the lease.

Emry received approval from Molasky for incorporating in the lease the two items requested by the pharmacy. Ryan and Pearsall later received the following letter from Emry, dated November 18, 1975, and Molasky received a copy:

"It is understood that the signatures to the Lease dated August 14, 1959, have relinquished their interests in the Quince Pharmacy and a partnership has evolved whereby Messers Joseph A. Ryan and Eugene A. Pearsall have entered into a partnership agreement to do business as Quince Pharmacy. Mr. Stanley Molasky and Hobson-Kerns Company, Inc., Agents, do agree to recognize this partnership as sub-lessees in accordance with the provisions of Article 13 of cited lease. It is understood and agreed that a new lease will be prepared within approximately ninety days from this date containing substantially the same provisions of the current lease except to delete all references to completion of construction of the business known as 5137 Quince and containing substantially the following terms which are to become effective on the first calendar day following the expiration date of the current lease on May 31, 1980:

"1. Ten year renewal effective June 1, 1980, with minimum rental first five years at $750.00 per month and minimum rental second five years at $850.00 per month.

"2. 3% of Gross Sales as percentage rental with minimums stated above.

"3. Same tax escalator clause.

"4. Annual maintenance charge $125.00.

"5. Additional clause to afford Quince Pharmacy exclusive rights to operate a Pharmacy in the Center.

"6. Option to renew with percentage and minimum rental open to negotiations."

It is undisputed and admitted that Emry was authorized to bind Molasky in these matters.

Based upon this understanding, Pearsall had bought Hudson's interest in the part-

nership for $50,000.00, and the new partnership of Ryan and Pearsall was formed.

Emry did not present the partners with the proposed lease within the ninety days stated, but did submit it to them sometime in mid-May, 1976. After reading the lease agreement the partners noted that the exclusivity clause and the renewal clause as agreed upon, (items 5 and 6) had been omitted. This omission was called to Emry's attention; he admitted that the omissions were through his oversight, and he took the unsigned lease documents back to his office for correction. Meanwhile, the owner, Molasky, was engaging in discussions with Poag regarding the possible sale of the shopping center. Molasky instructed Emry to do nothing further in regard to any uncompleted lease arrangements, and Emry did nothing as he was instructed. Molasky then closed the sale of the shopping center to Poag in mid-December, 1976, and agreed to indemnify Poag from any loss resulting from undisclosed tenant rights.

The partnership was unaware of a proposed sale of the shopping center until on or about December 1, 1976, when an agent from Schumacher, an insurance investigating firm, came to the pharmacy and requested the partners to sign an estoppel certificate stating they had no tenant rights except those contained in the original lease. The partners refused. After the sale Poag refused to honor or recognize in the partners any rights except those contained in the original lease. Thus, this suit by the partners against the Stanger Corporation and Poag has resulted. During the course of the litigation, Molasky, who was not named as a defendant, sought to intervene but was denied that privilege by the Chancellor.

The Chancellor ultimately ordered Poag to execute a lease to the partners under terms as outlined in the Emry letter, with the exception of the exclusivity feature which the partners had agreed to waive.

Poag has appealed, and eight "issues" have been presented by appellants' brief for our consideration; however, they can be condensed to only two principal issues. The first is whether the agreement between the partners and Molasky is susceptible to specific performance under the facts, and the second is whether the Chancellor erred in refusing to permit Molasky, as intervenor, from intervening in this suit.

We answer the second issue first. Molasky does not appeal from the denial of intervention. We hold a defendant has no right to appeal the denial of a stranger's petition to intervene when the intervening petitioner himself does not appeal that denial. We assume from the intervening petitioner's lack of appeal from that decision that he is content with it. We do not think this reviewing Court should now grant the petition to intervene when the intervenor, by his lack of appeal, has, in effect, withdrawn it. Nor do we believe we should in effect permit Poag to appeal Molasky's case. See *Ray v. Trapp* (1980 Tenn.) 609 S.W.2d 508.

Counsel for appellant insists that the agreement to lease is unenforceable because the proof fails to show that the terms of agreement set forth in the Emry letter were "subsequently assented to" by the tenants. Further, he alleges the terms, even if accepted, are too vague for specific performance; that there is no mutuality of remedy; that the plaintiff is guilty of laches; that at the time of the agreement one of the terms (the exclusivity clause) could not be provided by the then owners for "lack of clear title", and that it is inequitable for plaintiff to now waive that term and render the agreement specifically enforceable.

An agreement to lease is not a lease, just as a contract to sell is not a sale. However, in each case, the owner may be required to perform by a Court of Equity. A leasehold interest in real property is simply an interest less than the fee. A contract for the sale of less than the fee which would include a leasehold interest is specifically enforceable. See *Board of Education v. Board of Education*, (1929) 160 Tenn. (7 Smith) 351, 24 S.W.2d 889.

■ We find absolutely no merit in counsel for appellant's contention that the proof fails to show the terms of the Emry letter were "subsequently assented to" by the tenants. On the contrary, the evidence clearly shows that the partners did "assent to" the terms of the Emry letter. The facts surrounding the negotiations for this lease are plain and simple. Emry stated Molasky's terms for a new lease. Ryan and Pearsall agreed to those terms, but wanted additional items included in the lease. Emry then had these two terms approved by Molasky, and in writing, so advised Ryan and Pearsall. In reliance upon this letter, wherein Molasky, through his agent, agreed to lease the property on the negotiated terms, Pearsall purchased an interest in the partnership for $50,000.00. In the eyes of this Court, Pearsall's $50,000.00 investment is clear evidence of assent. Emry knew the partnership was to be formed on the basis of the newly negotiated lease, and he promised to present the agreed upon written lease to the partners within ninety days. Emry did not follow up with this written lease for approximately six months. When Emry finally did submit the lease, the partners found it did not contain the stated two agreements outlined in the Emry letter. They requested that such terms be inserted. Counsel for appellant invents the theory that the incomplete lease tendered by Emry was a "counter offer" by Molasky, which plaintiffs rejected by their failure to immediately sign. Hence, counsel contends no agreement was ever reached. Emry's testimony that the omissions were pure oversight on his part, and that he had every intention of placing such terms in the lease agreement, pierces to the core appellant's theory. Emry, and therefore Molasky, never intended to make a "counter offer" but only intended to live up to the original agreement.

■ Counsel for appellant also insists that because all forty-four items of the lease were not set forth in the agreement to lease, the agreement is too indefinite to be the subject of specific performance. Furthermore, it is charged that without regard to the omitted items, whether the lease as proposed by Emry was "substantially" the same as the old, is a serious question of dispute. This argument is merely a legal smoke screen. It is inconsistent for the drafter of an agreement to question whether or not it is substantially in compliance with the terms orally agreed upon. In short, he cannot draft the instrument, then say the instrument is void and refuse to honor it because it does not meet the agreed upon terms. Barring a mutual mistake, it is up to the non-drafting party to question the instrument, and only he may claim it unacceptable because it does not express the true agreement. The tenant accepted the Emry letter and accepted the tendered lease but for the admitted oversight. In addition to that, the defendant in his answer states "that said lease form (Emry's draft) was substantially in accordance with the terms and conditions of the said letter-offer of November 18, 1975." Defendant is judicially estopped to say otherwise.

Furthermore, Emry promised to insert the omitted provisions of the new lease and return it to plaintiffs. On that basis, he took the new unsigned lease back from plaintiffs. Plaintiffs had in effect then and there signed the Emry lease with the promised corrections made. It was the act of Molasky through Emry's taking back the lease for correction that prevented the actual signatures of plaintiffs from being physically placed on the document.

■ After having agreed to insert the omitted items Emry failed to submit a final lease because he was instructed by Molasky to cease all lease negotiations. Plaintiffs had a right to accept Emry at his word and they are not guilty of laches for failure to "keep after" Emry to obtain the written lease. It must be remembered that while the agreement to make a lease was effective, the effective date of the lease itself was four years off, thus there was no urgency on the tenants' part.

Counsel also argues that the suit must fail because of an alleged lack of mutuality of remedy. There is nothing to the argument. See *Jeffers v. Hawn*, (1948) 186 Tenn. 530, 212 S.W.2d 368.

A major argument on appeal is directed to the alleged "lack of clear title" issue. In the Quince Pharmacy original lease the pharmacy had only a limited exclusionary right, because the Weingarten grocery chain, also located in the Quince Shopping Center, had signed a lease prior in time to that of Quince Pharmacy, and Weingarten had been given the right to have a prescription department in their store. Therefore, Quince's first lease stated its exclusion did not apply to the Weingarten store. (During the twenty year term of the Weingarten lease it has been sublet on two occasions, so that the lease is finally held by Baker's Big Star.) Counsel for appellant argues that since by the terms of Quince's original lease, Quince was on notice of Weingarten's right to sell pharmaceutical items, the partners knew that it was impossible for Molasky to give an exclusive to Quince Pharmacy in the new lease. They further argue that Molasky could not contract to do something he could not legally carry out. In addition, the fact that plaintiffs have now waived that exclusivity clause does not cure the defect then existing; and, since specific performance could not then be had, it could not now be had.

This argument is also without merit. Both the Quince and Weingarten leases were twenty year leases, both expiring near the same time. As a consequence, both the Quince limited exclusive grant and the Weingarten grant to sell pharmaceuticals were both due to expire in 1980. We see no reason why Molasky could not have agreed to the strict exclusivity term in the Quince Pharmacy new lease effective in 1980 without any legal impediment. From our examination of the record it would appear that on November 18, 1975, Emry reached an agreement with the Quince Pharmacy as to the terms of a new lease, which lease was to be effective in 1980. As far as this record is concerned, no new agreement to lease has been made with Big Star (Weingarten's assignee) prior to that time. In short, if agreement were reached with Quince regarding a new lease prior to reaching any agreement with Big Star on any new lease, the exclusivity agreement to Quince is the binding one and any such new agreement with Baker would be the unenforceable one. However, since the exclusivity requirement was waived by Quince we do not have to rule on that issue.

Counsel for appellant also insists that the equities of the case are on his side. Suffice it to say, on that instance we are in total disagreement with him.

We find as a fact that an agreement to give a lease was entered into between Quince Pharmacy and Molasky and that the agreement was clear, definite, complete and subject to an order of specific performance as a matter of law as to the Stanger Corporation.

The judgment below is affirmed and all costs of appeal are adjudged against appellant and surety.

Done at Jackson in the two hundred and fifth year of our Independence and in the one hundred and eighty-sixth year of our Statehood.

MATHERNE, J., and HIGHERS, Special Judge, concur.