**Lillie OWENS and Neal Vaughn, Plaintiffs-Appellees,**

v.

**Almira CHURCH, Defendant-Appellant.**

Court of Appeals of Tennessee, Eastern Section at Knoxville.

March 15, 1984.

Permission to Appeal Denied by Supreme Court July 2, 1984.

Thomas D. Shelburne, Rogersville, for defendant-appellant.

Tom H. Rogan, Rogersville, for plaintiffs-appellees.

## OPINION

CONNER, Judge.

Plaintiffs-appellees, Lillie Owens and Neal Vaughn, sued their aunt, defendant-

appellant, Almira Church,[1] age 91, for specific performance of a contract under which it was alleged she agreed to will them all her property in exchange for their agreement to care for her for the balance of her life.

Ms. Church denied the existence of the agreement and asserted that, in any event, specific performance was not warranted. After a bench trial, the chancellor determined that a contract did exist. However, the trial court at first refused to grant specific performance on the theory that to do so would unjustly enrich plaintiffs. After an initial reference to a special master for a determination of damages or compensation due for services rendered, the plaintiffs filed a motion to alter or amend judgment, again seeking specific performance of the contract. This motion was granted by the chancellor and it was held that a 1975 will of defendant leaving all she had to plaintiffs must stand unrevoked and unchanged. Further, the property of Ms. Church was impressed with a trust in favor of plaintiffs, leaving defendant the right to withdraw whatever was necessary for her support. The niece and nephew were required to remain ready, willing and able to care for Ms. Church for the balance of her life in accordance with the terms of the agreement as found by the chancellor.

Ms. Church appealed raising three issues. They are:

I. Did the Trial Court err in finding that a contract existed between the parties?

II. Did Appellees exert undue influence upon Appellant in the execution of the 1975 will rendering enforcement of its provisions inequitable and unjust?

III. Did the Trial Court err in awarding specific performance even if a contract did exist?

■ At oral argument of this cause counsel for Ms. Church acknowledged that both the first two issues involved disputed

questions of fact. This matter is before us with a presumption of the correctness of the trial court. T.R.A.P. 13(d). Where a finding is based upon conflicting oral testimony this presumption "is entitled to more than the usual indulgence." *Capital City Bank v. Baker*, 59 Tenn.App. 477, 493, 442 S.W.2d 259, 266 (1969). The trial court's findings of fact dependent upon the credibility of the witnesses "is entitled to great weight." *Id.*

There is considerable evidence in this record supportive of the chancellor's finding that there was a contract and that it was not the result of undue influence. The plaintiffs' proof revealed that Ms. Moore, the owner of a home in Mooresburg in Hawkins County and a 222-acre farm in the Robinette Valley of Hancock County, and her sister, Nannie Church, lived together until Nannie died on November 23, 1975. By previous wills made by the Church sisters in 1971 they left life estates in all their property to each other. However, both wills provided that the remainders would go to the plaintiffs. By letter that same year Almira Church said: "We will have to take care of for what we have got. We have got plenty, for some one."

On December 1, 1975, shortly after Nannie Church expired, plaintiffs drove the defendant to the office of Attorney Eastman Partrum, now deceased, where defendant executed a new will, which provided in material part:

I give, devise, and bequeath all my property, both real and personal, wherever found or situate, to my niece, Lillie Owens, and my nephew, Neal Vaughn, as their absolute estates in equal interest. In the event Neal Vaughn should predecease me, then I devise and bequeath his undivided ½ interest to my niece, Lillie Owens. In the event Lillie Owens should predecease me, then her interest is to pass to her heirs at law. In the event I should survive Lillie Owens,

1. Hereinafter the parties will be referred to as in the trial court or by their names, as abbreviated.

Neal Vaughn and Shirley Owens, without issue, then I direct that my entire estate shall go to the Holston Methodist Home, Greeneville, Tennessee.

. . . .

*In making the above bequest to my niece and nephew, I am repaying them for the services they have rendered me in the past and with the obligation that they are to continue to look after and tend to me for the remainder of my life.*

*Regardless of how long I live I consider this a valid and complete consideration for services rendered.*

(Emphasis supplied.) [2]

Though Mr. Partrum had previously represented plaintiff Vaughn in auto accident case he was well known to the entire family and did the legal work for the probate of the estate of Nannie Church with Mr. Vaughn serving as executor. Though the defendant, testifying by deposition, said that she signed the 1975 will because she was afraid of the plaintiffs, their testimony was precisely to the contrary. There were no suspicious circumstances corroborated by third persons regarding the execution of the will. In fact, the will stayed in effect until Elmira Church executed two subsequent wills in 1979 and 1980. Each reduced the bequests to plaintiffs and, to the surprise of no one, shortly after this suit was filed Ms. Church executed yet another will awarding them $1.00 each. Even as late as 1979 in correspondence to her then attorney regarding a new will, Ms. Church stated: "I want Neal Vaughn and Lillie Owens to have my Mooresburg home and all that is in the house and $4,000 to take care of me and be good to me as long as I live."

Probably the most critical evidence in the record, no doubt heavily relied upon by the chancellor, was the deposition admission of defendant that "I told them they could

have what I had if they took care of me." Defendant's contention was simply that the plaintiffs "never did nothing" for her. According to the proof of plaintiffs, which the chancellor obviously believed, this simply was not the case.

The plaintiffs' proof shows that over the years, both before and after Ms. Church's move to Mooresburg, the plaintiffs performed a wide variety of services for her. In many instances, the plaintiffs' testimony in this regard is corroborated by the testimony of friends and neighbors of both parties to this action. Ms. Church acknowledges the performance of some services. However, she seeks to minimize the total impact of these services by describing them in isolation and qualifying the descriptions thereof with words such as "occasional," "infrequently," and "a few" along with implying the alleged *de minimis* nature of such services by labeling them "help." When viewed *in toto*, however, the assistance to her, spread over a period of a decade or more, was clearly substantial. There is no material proof other than that of Ms. Church, that plaintiffs ever failed to honor any reasonable requests made of them.

Mr. Vaughn testified that prior to the relocation to Mooresburg he moved a cow and did carpentry, plumbing and electrical work for Ms. Church. Ms. Owens stayed with the defendant for several days when the latter broke her arm. Moreover, according to their proof, plaintiffs took groceries to Ms. Church on a fairly regular basis. Though this is a seemingly minor service, its import is magnified when the remote location of Robinette Valley and its poor roads are considered.

When Ms. Church and her sister, Nannie, voiced some concern over living in so inaccessible a location, the plaintiffs did their house-hunting for them, locating the even-

---

**2.** These provisions appear to be precisely the type intended to be enforceable under the subsequently enacted "Trautman Act of 1978," T.C.A. § 32–308, which provides in pertinent part:

(b) *A contract to make a will* or devise, or not to revoke a will or devise, or to die intestate *can be established* only *by:*

(1) *Provisions of a will stating material provisions of the contract;*

(Emphasis supplied.)

tual residence in Mooresburg. According to their testimony, the plaintiffs assisted in the move itself and made the necessary arrangements with a commercial service to move the bulk of the defendant's property. Although Ms. Church denies such assistance, the plaintiffs' version was corroborated by a third party.

Following the move to Mooresburg, the plaintiffs continued to render services to her whenever asked. They testified that they ignored opportunities to move elsewhere under the agreement. The services which the niece and nephew maintain they provided Ms. Church while she resided in Mooresburg included the following: grocery shopping; garbage disposal; trips to the doctor; gardening; checking fuses; placing fertilizer around some trees; planting trees for which Ms. Church paid, but which the plaintiffs picked up and brought home; staying with defendant after her release from the hospital with a broken ankle; and cooking, cleaning, washing dishes, mopping and ironing for Ms. Church during this period when she could not do these things for herself.

Plaintiffs' proof was that on some occasions services of this nature were indeed performed for Ms. Church by others; but these instances were when this was her preference—and often arranged by plaintiffs—or when defendant went directly to others for assistance without giving Ms. Owens and Mr. Vaughn the opportunity to fulfill their obligations.

■ The chancellor having resolved the fact questions that the parties had made a contract, that plaintiffs had performed satisfactorily thereunder and, by implication, that there was no undue influence exercised over defendant in the 1975 will embodying the contract,[3] based upon this record we are in no position to hold otherwise. The chancellor alone observed the demeanor of the witnesses and is in a far better position than us to decide these matters. Accordingly, we concur in the findings of fact of the trial court. Therefore, the first two issues are respectfully found to be without merit.

Finally, Ms. Church complains of the chancellor's award of specific performance. Numerous jurisdictions adopt the view that the proper measure of damages for breach of contract to devise specific property is the value of the property to be bequeathed or devised. Annot., 65 A.L.R.3d 632 (1975). Under this rule where the contract is to devise the entire estate the measure of recovery for breach of that agreement would be the value of all property remaining after payment of debts, taxes and costs of administration. 79 Am.Jur.2d *Wills* § 349 (1975) and cases cited therein. Defendant concedes that if this is the rule in Tennessee that the action of the chancellor in impressing a trust upon the assets, subject to the right of Ms. Church to draw upon them for her reasonable maintenance and care, would be proper. However, defendant vigorously asserts that this is not the proper measure of damages in Tennessee—or at least it should not be; and that the better rule is that damages should be measured by the reasonable value of the services performed. *See Frieders v. Frieders' Estate,* 180 Wis. 430, 193 N.W. 77 (1923); *Murtha v. Donohoo,* 149 Wis. 481, 136 N.W. 158 (1912); *Collier v. Rutledge,* 136 N.Y. 621, 32 N.E. 626 (1892). Stated differently, Ms. Church asserts that even though there be a clear breach of contract, damages should only be allowed on a *quantum meruit* basis.

To the contrary plaintiffs assert that there should be no difference in the measure of damages for breach of a contract to make a specific bequest than would be the case with a default under any other contract; and moreover, that the injured party is entitled to equitable relief where, as here, if this is not granted the "willed

---

**3.** Though there was no direct finding of fact regarding the undue influence question, the holding necessitated such a conclusion, for had the chancellor found undue influence there would have been no binding contract. Thus, with sufficient evidence therefor in this record, it is proper for us to presume such finding. *See Cushing v. Thomson,* 118 N.H. 292, 386 A.2d 805, 806 (1978).

assets" may be squandered prior to death leaving the other contracting party nothing but a meaningless claim. We believe this rule is controlling in Tennessee.

In *Williams v. Buntin*, 4 Tenn.App. 340 (1927), the court was faced with a situation where a widow of means, Rachel Craighead, a resident of Nashville, had agreed to will a store owned by her on the public square in Nashville to a young lady, Ida Williams, who, though not related, was previously taken into her home by Mrs. Craighead and resided with her until the age of 21. The conditions of the agreement were that Mrs. Williams, then a non-resident, would return to Nashville, live with Mrs. Craighead for a period of years and take care of her. Mrs. Williams did this. However, in 1922, two years before her death and when in failing health, Mrs. Craighead sold the store to a third party for $25,000.00. After the death of Mrs. Craighead, Mrs. Williams sued her estate. In allowing recovery of the full value of the store the court held:

> In case of the breach of a contract to bequeath and devise property where the promisee has performed in full his covenants the measure of damages is the value of the property which the promisor obligated himself to bequeath and devise, at the time of the breach. . . .
>
> In 17 C.J., p. 866, discussing the subject the doctrine is thus stated:
>
> "Where, however, the contract is not to pay a sum stated in property but is to pay specific property, the measure of damages is the value of the property at the time of the breach."

4 Tenn.App. at 349 (citations omitted).

In *Cate v. Popejoy*, 19 Tenn.App. 643, 94 S.W.2d 51 (1935), this court in affirming the principle said:

> Continuing the analogy to an action for breach of an agreement to make a devise of property, it is generally held that the measure of damages in such cases is what the promisee has lost by the failure of the promisor to comply with his agreement, which is, ordinarily, the value of the property agreed to be bequeathed or

devised less proper deductions, and not the value of the services rendered or other consideration furnished by the promisee.

*Id.* at 646–47, 94 S.W.2d at 53.

*Page on Wills* states the general rule in these terms:

> As in the case of contracts in general, if a contract to devise or to bequeath property was valid when it was made and has not been discharged by facts which arose after it was made, the promisee who is injured by the promisor's breach of the contract may bring an action at law. In many cases, he may have a remedy in equity if he prefers such remedy to the remedy which the law gives him.

W. Bowe & D. Parker, *Page on Wills* § 10.27 (1960) (footnotes omitted). Though this treatise acknowledges that there are differing rules in some jurisdictions regarding the measure of damages, including "the value of the services" rule, a majority of states are listed therein as following the "contract" damages rule.

Regarding the grant of equitable relief as here given, the prevailing rule has been stated as follows:

> The circumstance that the promisee may not be able to establish the contract to devise or bequeath property after the promisor's death is a consideration in favor of equitable relief prior to the promisor's death, where the latter has repudiated the agreement. The lack of an adequate remedy at law to compensate the promisee for his services and support, or otherwise to protect his rights, has been a factor in the allowance of equitable relief. It appears that *most courts recognize that the repudiation by the promisor of a contract to devise property in consideration of services, in making a conveyance of the property to a third person, presents a case for equitable jurisdiction* upon the principle of quia timet to protect the rights of the promisee in the property by requiring the grantee to hold the property for the benefit of the promisor during his life and to

convey the property to the promisee upon the death of the promisor. *Relief to the promisee by way of impressing a trust upon the property for his benefit has been held proper in some cases.* 79 Am.Jur.2d *Wills* § 381 (1975) (footnotes omitted; emphasis supplied) and cases cited therein. *But see* 79 Am.Jur.2d *Wills* § 349 (1975). Professors Bowe and Parker state:

> While, as has already been indicated, the weight of authority is to the effect that a trust exists in favor of the promisee by reason of the existence of a valid contract to devise, language has been used which seems to indicate that the trust comes into existence when the promisor subsequently makes a will in performance of such a contract.... *If the promisor in his lifetime repudiates the contract and declares or manifests his intention not to be bound by it, equity may, on bill in the nature of quia timet, declare the property to be held in trust for promisee, his enjoyment to begin according to the terms of the contract.*

Bowe & Parker, *supra,* § 10.30 (emphasis supplied).

Just as here, a number of other courts have also impressed a trust upon the promisor's property to prevent the dissipation of that which should rightfully have gone to the promisee under the parties' contract to make a will. *See Turley v. Adams,* 14 Ariz.App. 515, 484 P.2d 668 (1971); *Ludwicki v. Guerin,* 57 Cal.2d 127, 17 Cal. Rptr. 823, 367 P.2d 415 (1961); *Matheson v. Gullickson,* 222 Minn. 369, 24 N.W.2d 704 (1946). As the court said in *Matheson v. Gullickson,* where relief almost identical to that in this case was granted to the promisees:

> [A] court in the exercise of its equity jurisdiction may render ... relief for the preservation of the rights of the promisee under an oral contract to bequeath the property left at the promisor's death to protect the promisee against loss from the promisor's breach or threatened breach of contract, and for this purpose the court may impress the promisor's

property with a trust in favor of the promisee, subject, however, to the rights of the promisor to consume or dispose of such property during his life except insofar as a disposition thereof may be a fraud upon the promisee.

24 N.W.2d at 705.

The defendant relies on two Tennessee cases, *In re Estate of J.O. Austin* (Tenn. App. filed June 30, 1983, in Nashville), and *Brown v. Fuqua,* 9 Tenn.App. 22 (1928), which we believe are distinguishable from the instant matter. First, in neither case were the courts faced with the question of specific enforcement. This is because the promissor in each case was deceased and obviously could not be compelled to perform his contractual duties. This is a significant variance from the instant case where a specific contractual agreement was alleged and proved to the satisfaction of the chancellor and this court. The inadequacy of injunctive relief or the imposition of a trust after the promisor's death is of course clear. More significantly, no express or implied agreement to convey any property was found in *Brown v. Fuqua* or *Austin,* despite the urging of Ms. Church that these cases and this matter are "fundamentally similar." Therefore, it cannot be said that *Brown v. Fuqua* or *Austin* preclude the granting of the relief afforded by the chancellor in this case.

In *Austin* the court quoted with approval from *Brown v. Fuqua:*

> Where one renders services to another in the hope or expectation of a legacy, devise, or other provision by will for his benefit, without any contract, express or implied, but relying solely upon the generosity of the person for whom such services were rendered, he cannot recover for such services because of the failure of such person to make such testamentary provision in his behalf, but if there was an express agreement to pay therefor, or circumstances from which one would be implied by law, or where there was an understanding that compensation should be made by will, and if the decedent failed, his estate is liable for the

value of the services on a quantum meruit basis.

9 Tenn.App. at 26. Defendant has construed that statement as the adoption by Tennessee of what we believe is the minority view that only recovery in *quantum meruit* may be had in matters of this nature. We cannot agree. In both *Brown* and *Austin,* the contract (express or implied) was that there would be "compensation" made by will for the services rendered. The precise extent of that compensation was not specified. However, here the express agreement ultimately reduced to writing in the 1975 will was, according to defendant's words, to leave to plaintiffs "what I had" in exchange for their commitment to take "care of me." Further, the plaintiffs have performed in the past and apparently are ready, willing and able to continue to perform their part of the bargain. No doubt the change of mind of Ms. Church regarding her affections and desires and this litigation have made the likelihood of further call by her for plaintiffs' services very remote. The relationship is probably broken beyond repair—at least from the view of Ms. Church. In fact, by deposition she testified:

Honey, I wanted to get it out of them dadburned sons of bitches Vaughns' hands.

. . . .

I wanted to get it out of their hands so bad I couldn't hardly stand it. Honey, I'd throw it in the river if I couldn't get it nowhere else. I'd throw it in the river.

Independent of the three new wills, each giving plaintiffs less, this is about as strong a renunciation of the agreement as can be imagined. Obviously, if plaintiffs were denied extraordinary relief to preserve the assets until the death of Ms. Church, given her present attitude, it appears that there would be little or no estate from which any recovery could be paid, either in *quantum meruit* or contract. The inadequacy of a remedy at law under these circumstances is clear, as is the irreparability of harm the plaintiffs would likely suffer if these assets were not "protected."

We have no quarrel with the concept of compensation on the basis of unjust enrichment in matters involving a future legacy in exchange for present services where there is no express agreement as to precisely with what or how the provider will be payed. However, where there is such an express agreement we believe Tennessee is in the majority of jurisdictions that treat this sort of contract like any other, both in terms of the measure of damages, *Williams v. Buntin,* 4 Tenn.App. at 349, and the award of extraordinary relief, where necessary.

As we are sure was the case with the trial court, based upon its original ruling, we are not entirely satisfied with the result reached in this case. Considering the quantity of services that plaintiffs have been *asked* to render under the contract and the apparent size of Ms. Church's estate, at first blush it appears that Ms. Owens and Mr. Vaughn may be receiving a windfall. However, when made the contract was for a valid consideration, the disparity of which is not such as to "shock the conscience." *See Matthews v. Matthews,* 24 Tenn.App. 580, 594, 148 S.W.2d 3, 12 (1940). Had Ms. Church been bedridden and asked the plaintiffs to "take care of me" on a daily basis for the past nine years and had such care been reasonably required, or should this occur now or in the future, as we understand the agreement the plaintiffs would have been (or would be) required to do so. Otherwise, they would have been (or would be) in breach and would lose the benefit of their existing contractual rights. Under such "hypothetical" circumstances the ultimate "bargain" to plaintiffs might be considerably less than as now portrayed. In any event, we believe the old adage that "bad facts make bad law" would here apply if we were to look only to the "unjust enrichment" approach to damages and ignore the fact that the chancellor found the existence of a binding contract based upon valid consideration between competent (and still living) adults; further, that the contract has been

breached; and the damages resulting therefrom to plaintiffs are subject to being avoided without the equitable remedy shaped by the chancellor.

 Or stated a little differently, to entitle the promisee to relief in equity such as specific performance or impressing a trust the contract must be clear and certain, Bowe & Parker, *supra*, § 10.33, and it must be fair and reasonable in character. *Id.* § 10.34. However, *"[t]he fairness of a contract for support is to be determined by the circumstances as they appeared when the contract was made, and not by the extent of the actual performance."* *Id.* (Emphasis supplied.)

It would seem that the fairness of the contract should be determined by the facts as they appear when the contract is made, and not by the facts as they appear when performance is rendered. The promisee, especially in a contract to support the promisor, takes the risk of being bound to render performance which may exceed the value of what is promised in consideration of such performance. In such a case it could not be claimed that the promisee should receive more than he was promised. Therefore, the contract should not be treated as unfair on the ground that, in the particular case, the promisee has been called upon to do less than was expected. The promisor's main interest in the bargain is security for the rest of his life; and if he has enjoyed this security, the length of time for which performance has been rendered should not prevent recovery by a promisee who has rendered all of the performance which is called for by the terms of the contract.

*Id.*

 The freedom and sanctity of contract are cornerstones of our system of commercial law and order. Regardless of where our sympathies might lie in a given case, once it has been determined that a valid agreement is in existence the courts must enforce that contract. In the event of a breach thereof, the chancellor has wide discretion in shaping legal and, where nec-essary, equitable remedies. *See* 27 Am. Jur.2d *Equity* § 102 (1966). We find no abuse of that discretion here. To the contrary, we believe the chancellor shaped the proper remedy.

Accordingly, this cause is affirmed and remanded. The costs are taxed against the defendant.

AFFIRMED AND REMANDED.

PARROTT, P.J., and GODDARD, J., concur.