# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
February 3, 2000 Session

## JERRY LaQUIERE, ET AL. v. DANIEL W. McCOLLUM

**Extraordinary Appeal from the Chancery Court for Davidson County**
**No. 99-962-I     Irvin H. Kilcrease, Jr., Chancellor**

---

**No. M1999-00926-COA-R10-CV - Filed February 23, 2001**

---

This appeal involves a dispute arising out of the sale of a tract of real property in Antioch.  After a survey revealed that the size of the tract was significantly less than the size stated in the contract, the purchaser filed suit in the Chancery Court for Davidson County seeking both specific performance of a provision in the contract requiring an adjustment in the purchase price and damages for breach of contract and misrepresentation.  The purchaser also filed a lis pendens notice with the Davidson County Register of Deeds.  The trial court granted the vendor's motion for summary judgment on the issue of specific performance and ordered the lis pendens notice removed.  However, the trial court declined to grant summary judgment on the issue of damages for breach of contract and misrepresentation.  We granted the purchaser's Tenn. R. App. P. 10 application for an extraordinary appeal. We now affirm the trial court because we concur with its conclusion that the price adjustment provision in the contract is not clear, definite, and complete.

**Tenn. R. App. P. 10 Extraordinary Appeal; Judgment of the Chancery Court Affirmed and Remanded**

WILLIAM C. KOCH, JR., J., delivered the opinion of the court, in which WILLIAM B. CAIN and PATRICIA J. COTTRELL, JJ., joined.

Robert J. Notestine, III and Joseph V. Ferrelli, Nashville, Tennessee, for the appellants, Jerry LaQuiere and Donna LaQuiere.

H.E. Miller, Jr., Gallatin, Tennessee, for the appellee, Daniel W. McCollum.

## OPINION

In October 1997, Daniel McCollum purchased two adjacent tracks of land in Antioch.  The larger tract ("Tract 1") consisted of approximately 15 acres with a house, a barn, and a shed constructed on it.  The smaller tract ("Tract 2") consisted of approximately 7.5 acres of unimproved property.  On November 23, 1998, Mr. McCollum sold most of Tract 2 and one-half of an acre of Tract 1 to the Tennessee Valley Authority ("TVA").  In the same deed, Mr. McCollum gave the TVA an easement over the remaining parts of both tracts.  As best as we can determine from the record provided, Mr. McCollum owned approximately 14.81 acres following this transaction.

In early 1999, Mr. McCollum listed his property for sale with Daniel & Neese Realty & Auction Co. ("Daniel & Neese") in Shelbyville. Janice Carlton, the listing agent employed by Daniel & Neese was unavailable between January 29 and February 4, 1999, but in her absence, Mr. McCollum completed the standard form "listing contract" used by Daniel & Neese and returned it to Ms. Carlton's office. Upon receiving the completed form, Ms. Carlton's secretary entered the information from the form contract into the Multiple Listing Service.

Shortly after the listing for Mr. McCollum's property appeared, Jerry LaQuiere telephoned Daniel & Neese to inquire about the property. Geraldine Neese, another real estate agent employed by Daniel & Neese, fielded the call. Ms. Neese asserts that she told Mr. LaQuiere during that telephone conversation that the two tracts consisted of approximately 13.5 acres. Mr. LaQuiere denies that Ms. Neese provided him any information about the size of the tracts and asserts that he believed that the property consisted of 22 acres based on the MLS information available to him at the time.

Following his conversation with Ms. Neese, Mr. LaQuiere and his wife, Donna LaQuiere, decided to make an offer to purchase the property. Accordingly, Mr. LaQuiere, himself a real estate broker, prepared a contract of sale that described the property as comprising 21.63 acres. The agreement specified a purchase price of $295,000 but also provided that "[s]hould a registered land survey determine the actual acreage is greater or less than stated above, the purchase price shall be adjusted accordingly at the per acre rate as used in a county appraisal." The LaQuieres signed the contract on February 3, 1999, and sent it to Ms. Carlton.

Ms. Carlton received the LaQuieres' contract when she returned to her office on February 4, 1999. When she contacted Mr. LaQuiere, she discovered that he was already aware of Mr. McCollum's conveyance to the TVA. She informed Mr. LaQuiere that she could not confirm the acreage figure he had included in the contract. Ms. Carlton also arranged for Messrs. McCollum and LaQuiere to meet on February 7, 1999, to finalize the terms of the purchase.

When Messrs. McCollum and LaQuiere met on February 7, 1999, Ms. Carlton asked Mr. LaQuiere to explain how he had arrived at the 21.63 acre figure that he had included in the contract. Mr. LaQuiere responded that he had obtained the information from county land records. According to Mr. McCollum, he told Mr. LaQuiere during the meeting that he had sold a portion of his property to the TVA but that he believed that he still owned approximately 22 acres. Mr. McCollum also asserts that he relied on Mr. LaQuiere's calculation that the total amount of land involved was 21.63 acres because Mr. LaQuiere was himself a real estate broker. Accordingly, Mr. McCollum signed the contract that Mr. LaQuiere had prepared.

Two days later, the LaQuieres encountered a TVA surveying crew on the property they thought they had contracted to purchase. The crew informed them that the TVA had recently purchased the property. Mr. LaQuiere insists that this was the first time he became aware that the property he thought he had purchased had already been purchased by the TVA. Accordingly, Mr. LaQuiere retained C. Michael Moran, a registered land surveyor, to determine the actual acreage of the property he had purchased. Mr. Moran's first survey, completed on February 18, 1999, and based

only on the deeds of record, showed that Tract 1 included 13.68 acres and that Tract 2 included 0.2 acres.

On February 23, 1999, Mr. LaQuiere formally notified Ms. Carlton of the results of Mr. Moran's survey. In his letter, he invoked the provision in the contract entitling him to an adjustment in the sales price. He asserted that the average per acre value of the remaining property following the sale to TVA was $8,578. Accordingly, he offered to purchase the property for $8,578 per acre.[1] When Mr. LaQuiere received no response to his letter to Ms. Carlton, he instructed his lawyer to communicate directly with Mr. McCollum. The lawyer's March 8, 1999 letter stated that the closing would occur on March 16, 1999, at the Guaranty Title and Escrow Company in Antioch.

The LaQuieres and a representative of Mr. McCollum appeared at the designated place and time for the closing. The LaQuieres tendered $179,984.31, the purchase price they believed to be appropriate after adjusting for the reduced acreage. Mr. McCollum's representative had the authority to execute the closing documents on his behalf, but only if the sales price was $295,000 as reflected in the contract of sale. With the parties at an impasse, the closing did not occur.

On March 15, 1999, Mr. Moran completed his second survey of the property. This time he performed a more accurate field survey which revealed that the tracts contained 14.81 acres. During the following month, the Division of Tax Assessments completed a new appraisal of the property. As a result of the 1998 sale of a portion of the property to the TVA, the new appraisal differed substantially from the former one. In Tract 1, 5 acres were valued at $12,0000 per acre; 5 acres were valued at $7,500 per acre; and 3.05 acres were valued at $5,250 per acre. The remaining Tract 2 property was valued at $7,500 per acre. Accordingly, the total value of the combined acreage of both tracts, excluding the buildings, was $121,013.

On April 5, 1999, the LaQuieres sued Mr. McCollum in the Chancery Court for Davidson County, alleging misrepresentation and breach of contract, and seeking compensatory damages and specific performance. They also filed a lis pendens notice to inform potential purchasers that they claimed a lien on the property pending the outcome of the litigation. Thereafter, Mr. McCollum filed a motion for partial summary judgment seeking dismissal of the LaQuieres' claim for specific performance and removal of the lis pendens notice. On August 6, 1999, the trial court entered an order summarily dismissing the LaQuieres' claim for specific performance and removing the lis pendens notice. The trial court did not dismiss the LaQuieres' claim for money damages for breach of contract and misrepresentation. The LaQuieres applied for a Tenn. R. App. P. 10 extraordinary appeal on August 13, 1999. On August, 27, 1999, after receiving Mr. McCollum's response, a member of this court granted the LaQuieres' application for an extraordinary appeal.

---

[1]Mr. LaQuiere calculated the average value of Mr. McCollum's remaining property by using a January 1998 appraisal of the property prepared by the Metropolitan Government's Division of Tax Assessments. This appraisal had been completed prior to the sale of portions of the property to the TVA. It had assigned different values to various portions of the two tracts. The total appraised value of Tract 1, excluding the improvements, was $161,509. Mr. LaQuiere arrived at an average of $8,578 per acre by dividing the total appraised value of Tract 1 ($115,800) by the number of acres in the tract according to the appraisal (13.5 acres).

# I.
## STANDARD OF REVIEW

The standards for reviewing summary judgments on appeal are well-settled. Summary judgments are proper in virtually any civil case that can be resolved on the basis of legal issues alone. *Fruge v. Doe*, 952 S.W.2d 408, 410 (Tenn. 1997); *Byrd v. Hall*, 847 S.W.2d 208, 210 (Tenn. 1993). They are not, however, appropriate when genuine disputes regarding material facts exist. Tenn. R. Civ. P. 56.04. Thus, a summary judgment should be granted only when the undisputed facts, and the inferences reasonably drawn from the undisputed facts, support one conclusion – that the party seeking the summary judgment is entitled to a judgment as a matter of law. *White v. Lawrence*, 975 S.W.2d 525, 529-30 (Tenn. 1998); *Shadrick v. Coker*, 963 S.W.2d 726, 731 (Tenn. 1998); *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997). If a party defends against a claim with a motion for summary judgment, the party asserting the claim may only overcome the motion by establishing the essential elements of the claim. *White v. Methodist Hosp. South*, 844 S.W.2d 642, 645 (Tenn. Ct. App. 1992); *Blair v. Allied Maint. Corp.*, 756 S.W.2d 267, 270 (Tenn. Ct. App. 1988).

Summary judgments enjoy no presumption of correctness on appeal. *Nelson v. Martin*, 958 S.W.2d 643, 646 (Tenn. 1997); *City of Tullahoma v. Bedford County*, 938 S.W.2d 408, 412 (Tenn. 1997). Accordingly, appellate courts must make a fresh determination that the requirements of Tenn. R. Civ. P. 56 have been satisfied. *Hunter v. Brown*, 955 S.W.2d 49, 50-51 (Tenn. 1997); *Mason v. Seaton*, 942 S.W.2d 470, 472 (Tenn. 1997). We must consider the evidence in the light most favorable to the non-moving party, and we must resolve all inferences in the non-moving party's favor. *Terry v. Niblack*, 979 S.W.2d 583, 585 (Tenn. 1998); *Robinson v. Omer*, 952 S.W.2d 423, 426 (Tenn. 1997). When reviewing the evidence, we must determine first whether factual disputes exist. If a factual dispute exists, we must then determine whether the fact is material to the claim or defense upon which the summary judgment is predicated and whether the disputed fact creates a genuine issue for trial. *See Byrd v. Hall*, 847 S.W.2d at 214; *Rutherford v. Polar Tank Trailer, Inc.*, 978 S.W.2d 102, 104 (Tenn. Ct. App. 1998).

A party may obtain a summary judgment by demonstrating that the non-moving party will be unable to prove an essential element of its case. *Byrd v. Hall*, 847 S.W.2d at 212-13. Once the moving party demonstrates that it has satisfied Tenn. R. Civ. P. 56's requirements, the non-moving party must show that Tenn. R. Civ. P. 56's requirements have not been satisfied. *Nelson v, Martin*, 958 S.W.2d at 647. One way for a non-moving party to fend off a motion for summary judgment is to convince the trial court that there are sufficient factual disputes to warrant a trial. The non-moving party may carry its burden by (1) pointing to evidence either overlooked or ignored by the moving party that creates a factual dispute, (2) rehabilitating evidence challenged by the moving party, (3) producing additional evidence that creates a material factual dispute, or (4) submitting an affidavit in accordance with Tenn. R. Civ. P. 56.07 requesting additional time for discovery. *McCarley v. West Quality Food Serv.*, 960 S.W.2d 585, 588 (Tenn. 1998); *Byrd v. Hall*, 847 S.W.2d at 215 n.6; *DeVore v. Deloitte & Touche*, No. 01A01-9602-CH-00073, 1998 WL 68985, at *3 (Tenn. Ct. App. Feb. 20, 1998) (No Tenn. R. App. P. 11 application filed).

## II.
### THE LAQUIERES' SPECIFIC PERFORMANCE CLAIM

The LaQuieres assert that the trial court erred by granting Mr. McCollum's summary judgment motion on the issue of specific performance and seek a reversal of the order to remove the lis pendens notice. Our decision regarding the summary judgment will also determine whether the trial court correctly ordered the removal of the lis pendens notice. If the LaQuieres are entitled to specific performance, lis pendens is necessary to warn potential purchasers of the property. If not, the LaQuieres are only entitled to damages, if anything, from Mr. McCollum. In that case, there is no need to warn purchasers. With this in mind, we turn to the issue of specific performance.

Specific performance is an equitable remedy. *Miller v. Resha*, 820 S.W.2d 357, 360-61 (Tenn. 1991); *Lane v. Associated Hous. Developers*, 767 S.W.2d 640, 643 (Tenn. Ct. App. 1988); *Owens v. Church*, 675 S.W.2d 178, 185 (Tenn. Ct. App. 1984). It is available only when the remedy at law is inadequate. *Williamson County Broad. Co. v. Intermedia Partners*, 987 S.W.2d 550, 554 (Tenn. Ct. App. 1998). Because a decision to grant specific performance depends heavily upon the facts of each case, granting specific performance lies within the trial court's sound discretion. *McGaugh v. Galbreath*, 996 S.W.2d 186, 191(Tenn. Ct. App. 1998); *Inman v. Union Planters Nat'l Bank*, 634 S.W.2d 270, 274 (Tenn. Ct. App. 1982). However, a court may not grant specific performance unless the contract is clear, definite, complete, and free from any suspicion of fraud or unfairness. *McGaugh v. Galbreath*, 996 S.W.2d at 191; *Estate of Sinclair v. Keith-Sinclair Co.*, 894 S.W.2d 747, 750 (Tenn. Ct. App. 1994); *GRW Enters., Inc. v. Davis*, 797 S.W.2d 606, 614 (Tenn. Ct. App. 1990); *Ryan v. Stanger Inv. Co.*, 620 S.W.2d 505, 510 (Tenn. Ct. App. 1981).

The trial court correctly granted Mr. McCollum's defensive summary judgment motion because the LaQuieres failed to an establish an essential element of their claim for specific performance – that the contract is clear, definite and complete. While several ambiguities exist in the contract, we will focus on the two that cause us the most consternation. First, the contract provides for a reduction in the purchase price of the property if a "registered land survey" reveals that the property is more or less than the 21.63 acres stipulated in the contract. Registered land surveys are not used in Tennessee,[2] and the contract's use of this term creates confusion as to what type of survey is acceptable.

Second, the contract provides for an adjustment in the per acre price of the property in the event that the tract is less than 21.63 acres. However, the contract's method for determining the amount of the per acre adjustment is unclear. The contract calls for adjusting the price according to "county appraisal" values. However, the contract does not prescribe which "county appraisal" values to use. For example, do we look to the actual appraised value of each of the missing acres, or should we look to an average per acre appraised value? In his February 23, 1999 letter, Mr. LaQuiere opted for the latter without explaining why. If we follow Mr. LaQuiere's lead and use an average per acre value, which average should we use? Mr. LaQuiere's February 23, 1999 letter partially demonstrates this problem by showing two equally viable average per acre appraised values – (1) that of

---

[2]Mr. Moran testified that in other states, such as Georgia, a "registered land survey" is a survey reduced to plat form that satisfies recording requirements.

surrounding properties or (2) that of Tract 1.[3] Other possible average per acre appraised values could be that of Tract 2, that of both tracts, or that of both tracts combined with the surrounding properties.

This confusion is compounded by the contract's failure to specify whether to use the 1998 appraisal before the sale to the TVA or the 1999 appraisal after the sale to the TVA. Equally plausible interpretations of the contract would permit use of the most recent appraisal existing (1) when the parties signed the contract (the 1998 appraisal); (2) when the alleged breach of contract occurred (the 1998 appraisal); (3) when the LaQuieres filed suit (the 1999 appraisal); or (4) when the trial court conducted the summary judgment hearing (the 1999 appraisal).

Our choice of which appraisal to use affects the average per acre value. The 1998 appraisal values five acres in Tract 2 at $8,000 per acre, and 3.13 acres at $1,800 per acre. According to the 1999 appraisal, the sale to the TVA left one acre in Tract 2, worth $7,500. The average will also be affected by the fact that the 1999 appraisal values less land than the 1998 appraisal, thereby reducing the denominator. Because the acres sold to the TVA differ in value from the acres retained, the change in the numerator (the sum of the actual values per acre) is not precisely proportionate to the change in the denominator.

These contractual ambiguities make it impossible to grant specific performance. Even assuming that a survey carried out by Mr. Moran, a registered surveyor, qualifies as a "registered land survey" under the contract, we have no way to determine what per acre adjustment in price the parties agreed to. Without knowing this, the trial court could not order Mr. McCollum to transfer the property to Mr. LaQuiere according to the terms of the contract. We hold that the trial court did not abuse its discretion in refusing to grant specific performance, and that it correctly ordered the removal of the lis pendens notice.

## IV.

We affirm the judgment dismissing the LaQuieres' specific performance claim and removing the lis pendens notice and remand the case to the trial court for whatever further proceedings may be required. We also tax the costs of this appeal to Jerry and Donna LaQuiere and their surety for which execution, if necessary, may issue.

_____
WILLIAM C. KOCH, JR., JUDGE

---

[3]Mr. LaQuiere's letter also mentioned that Mr. McCollum received an average price of approximately $13,000 per acre from his sale to the TVA.