**Lota Davidson Jones MERRIMAN et al.**

v.

**Jo Ann Jones MOORE et al.**

Supreme Court of Tennessee.

June 23, 1980.

James A. Hopper, Savannah, for appellants.

Ray Hollis, Waynesboro, for appellees.

## OPINION

FONES, Justice.

This is a controversy between life tenants and remaindermen over the right of the life tenants to cut, sell, and retain the proceeds of timber. Specifically, the determinative issue in this Court is whether the timberland consisting of 650 acres of a 750 tract acre was a tree farm.

The learned chancellor and the Court of Appeals held that it was not a tree farm. The proof relevant to the tree farm issue is undisputed and in our opinion requires an adjudication in the affirmative.

W. J. Davidson died testate on August 26, 1941, survived by his wife Van and two daughters, plaintiffs Lota Davidson Jones Merriman and Lella Davidson Rogers, and three grandchildren. His widow Van died in 1972. Lella Davidson Rogers had three children, plaintiffs Josephine R. Lawley, William Rogers and Francis R. Kimbrough. Lota Davidson Jones Merriman had one daughter, defendant Jo Ann Jones Moore. All of the testator's grandchildren were living at the time of his death except Francis R. Kimbrough. Lota is now seventy years of age and Lella is approximately seventy-four years of age. The trial court and the Court of Appeals construed the will of W. J. Davidson as devising the land to his widow for life, then to his daughters Lota and Lella for life, then to his grandchildren for life, provided that the fee simple estate would vest in the testator's heirs twenty-one years and ten months after the last life in being at the date of testator's death. We affirm that adjudication.

This suit was brought seeking approval of a timber cutting contract between the present life tenants, Lota Merriman and Lella Rogers, and plaintiff River Heights Lumber Company, or in the alternative an adjudication that the life tenants were entitled to selectively cut the timberland consistent with good tree farming practice. It was their theory that the testator had periodically cut the timber on the 650 acres and in other respects treated the timberland as a tree farm and that the life tenants are entitled to the proceeds of a periodic cutting of the tree farm. In the alternative, plaintiffs insist that if the 650 acres of timberland is not a tree farm, a periodic selective cutting of the timber will enhance the value of the Davidson timber tract, is "good husbandry," and the proceeds of a cutting for that purpose belong to the life tenants, citing *Thompson v. Thompson,* 206 Tenn. 202, 332 S.W.2d 212 (1960).

*Thompson* clearly stands for that proposition, and, in addition, that Court stated the "tree farm" exception as follows:

> "It is a universal rule that a tenant for life who is impeachable for waste may not cut timber for sale for the purpose of profit, or authorize another to do the same, unless in the one instance it be a tree farm or wild land valuable and operated only for its timber. 21 A.L.R. 1004, citing *McKee v. Dail,* 1 Tenn.Ch.App. 689." *Id.* at 212–13, 332 S.W.2d at 226.

A more complete statement of the rule and its rationale appears in *First National Bank of Mobile v. Wefel,* 252 Ala. 212, 40 So.2d 434 (1949):

> "But there has grown up an exception to this rule originating in England, and adopted in some states in this Country, and apparently disapproved by none who have had occasion to treat it. The exception applies to estates, which were cultivated by the settlor and this custom has continued after his death, to produce salable timber where the timber is cut periodically. The reason assigned is that protecting and cutting timber periodically and pursuing a system of reforestation is a mode of cultivation, and such product is

not then a part of the inheritance but part of the so-called annual fruits of the land; and in such cases the same kind of cultivation may be carried on by the tenant for life that has been carried on by the settlor; and the timber so cultivated and cut periodically is looked upon as annual profits of the estate when reforestation is pursued and therefore goes to the tenant for life." 40 So.2d at 437.

Significant here is the following statement with respect to the rights of life tenants in timberlands by this Court in *Lunn v. Oslin,* 96 Tenn. 28, 33 S.W. 561 (1896):

> "It is evident, from an examination of the authorities, that the decision of the Court as to what constitutes waste, and what is permissible use of timber, is largely dependent upon the locality of the property and the extent and value of the timber. Thus, as stated in *Owen v. Hyde,* 6 Yerg. 340, the law must necessarily be varied in this country from the English doctrine. There timber is scarce, and forest trees are planted and raised for fuel and timber, and it is of too much value to permit its unnecessary destruction. Here, on the contrary, a benefit often results to the estate by clearing away the timber, and it would be absurd to apply the rigid principles of the English law to a state of things wholly variant from theirs. The same difference exists between different States of the Union, in some of which the careful husbanding of timber is a matter of prime importance, while in others the clearing away of the forests is not only necessary to the use, but highly beneficial to the land." *Id.* at 32, 33 S.W. at 562.

■ It follows that in making a determination of whether a timber tract is a tree farm, consideration must be given to the type of marketable timber the land producers, the extent of reforestation necessary, and the growth cycle.

It is appropriate to note at this point that the undisputed proof in this case is that the Davidson timber tract does not require any reforestation or planting, that it produces hardwood timber and is reforested by na-

ture, which circumstance requires selective cutting and thinning to enhance production of marketable hardwood timber.

Defendant Jo Ann Jones Moore and the guardian ad litem, on behalf of the unknown heirs of Lota Merriman and Lella Rogers, insisted in the trial court that the Davidson timber tract was not a tree farm and that any diameter-limit cutting, as contemplated in the contract with River Heights Lumber Company, or any selective cutting would constitute waste, diminish the value of the remainder estate, and should not be allowed.

The Chancellor's final decree, as amended, directed the two consulting foresters who testified as expert witnesses to submit a selective cutting plan that would assure a ten to fifteen year growth and harvest cycle; that upon approval of the plan, and court sale of the cutting rights, the proceeds would be invested and the interest thereon paid to the life tenants upon request, the principal to vest with the fee at the time aforesaid. Parenthetically, the effect of the Chancellor's decree was to direct that the Davidson timber tract be "tree farmed" under professional management supervision until the vesting of the fee. The Court of Appeals modified that holding to provide for an annual distribution to the life tenants of $\frac{1}{32}$ of the principal, on the theory that a full growth cycle of timber requires thirty to thirty-five years, and that the life tenants are entitled, in equity, to the value of the annual growth.

Lota Davidson Merriman testified that she was born on September 24, 1909, and that her father was a farmer all of his life and owned the farm that is the subject of this controversy for as long as she could remember. She testified that her father built one of the houses on the farm in approximately 1908 with part of a large timber cut. She remembered him saying that some of the timber had to be seasoned for the windows and the roof and that the timber cut was used to pay the carpenters. She also remembered that her father sold timber to Holthouse and Hartup, a hickory mill, cedar to Close Lumber Company and Rex Cole, and white oak to Harbour Hardin from Savannah. She recalled that a large amount of timber was cut from the timber tract between 1930 and 1935. She testified that during WWII prisoners of war cut all the dead chestnut on the Davidson timber tract and it was sold for dye wood. She testified that her mother cut and sold some timber between 1955 and 1960.

Michael Martin, a consulting forester, described the Davidson timber lands as:

"A series of steep ridges, very dry sites in the upland, with mostly chestnut and postoak, because those are fairly slow growing; the hollows are in a lot better shape and have better species composition and better quality, it is basically just hill hardwood timber land."

He was asked if the 650 acres of timber land could be used for anything else and he responded that ". . . the topography of this land would certainly limit it to its use, it is very steep land." The fact that the testator did not increase the 100 acres of land under cultivation during the period of more than thirty years that he owned, lived on, and farmed the land is silent confirmation of the single use of the 650 acres in timber.

The learned chancellor filed written findings of fact. His findings with respect to the tree farm issue follow:

"The Plaintiffs bring their law suit alleging that this tract is a tree farm, or, in the alternative, that it is wild land. The Court holds and finds that it is neither. Mr. Michael Martin, a consultant forester, who testified for the Plaintiffs, defined a tree farm for the Court. His definition of such a farm is, 'a tract of land managed for sustained production of timber.' The key word in Mr. Martin's definition is 'sustained'. Webster defines 'sustain' as 'to maintain; keep in existence; prolong: as, sustained . efforts,' Webster's New World Dictionary of the American Language (1964), p. 475. Black's Law Dictionary, Fourth Edition, pp. 1616–1617, defines this word as 'to carry on; to maintain; to endure or undergo with failing or yielding.' It is clear then that this

tract is not capable of sustained production of timber. It is too small. In order to allow sustained production, the tract would have to be large enough that the annual growth of the timer would be equal to the amount cut each year. Two foresters agreed that cutting the annual growth as an annual basis from a tract this small was not economically feasible."

■ Mr. Martin had formerly worked for the Tennessee River Pulp and Paper Company managing 60,000 acres of timber owned by that company. His definition of a tree farm was obviously in the context of large, company owned and professionally managed tracts. His definition is not the legal definition of a tree farm and we reject it as such. The quotation appearing in the chancellor's findings of fact is incomplete. The definition given by Mr. Martin was as follows: "A tract of land with sustained timber production using good forestry management techniques." In any event, the proof is undisputed that this land produces a sustained growth of hardwood timber whether managed or not managed. Both Martin and Beavers testified that it was one of the best stands of hardwood timber in that area of Tennessee.

■ The fact that the testator W. J. Davidson did not manage his timber tract in accord with the best forestry practices, from time to time, does not preclude finding that it was a tree farm.

The chancellor's conclusion that the 650 acre tract was too small to be a tree farm was directly contrary to the following undisputed testimony of Mr. Martin:

"Q. Now there is no way, essentially, on a body of land like this, to remove the annual growth is it, a body of land say consisting of 650 acres or 700 acres?
A. Not on an annual basis.
Q. That is right, but that is what you have on a tree farm is it not?
A. No sir, you wouldn't. It might help if I mentioned here that the American Tree Farm System sanctions the management of tracts or farms, some of which are locally managed, and some are smaller in acreage than this tract in question, and of course they go to larger tracts too, but there are tracts a lot smaller than this that are managed as tree farms."

■ The fact that a timber tract cannot produce an annual marketable cutting because of small acreage, slow growing hardwoods, or other reasons, does not preclude a finding that it is a tree farm.

As indicated above, the chancellor's final disposition of this case conclusively demonstrates that he regarded the Davidson timber tract as a tree farm not suitable for any purpose other than to produce hardwood timber. At the final hearing of the motion to alter judgment, the chancellor directed this question to the expert witness Beavers:

"*The Court* —. . . And we are trying to set up a maintenance plan to make this into a tree farm. And you think this is the best method to preserve that?
A. I definitely do."

Mr. Beavers' maintenance plan was accepted by the Court and incorporated into the final decree. In essence it directs that the two foresters who testified, Martin and Beavers, submit to the master a selective cutting plan showing the dimensions of the timber to cut, at what height above the ground, and to submit a stock and stand table reflecting the future growth potential of the remaining timber, assuring a ten to fifteen year growth and harvest cycle. Upon approval of the selective cutting plan and the stock and stand table, a court sale would be ordered, and the foresters would supervise the cutting to insure that only the designated trees were cut.

■ The undisputed proof in this case requires the legal conclusion that the Davidson timber tract of 650 acres was a tree farm at the time of the testator's death. That land was not used by the testator for any other purpose, and the timber was periodically cut and sold for profit. It cannot now be used for any other purpose, and the lower courts have so decreed and placed it under professional management to be operated as a tree farm. With that adjudication we are in accord, but the

life tenants are entitled to all of the net proceeds of timber sales after payment of expenses of management, sale and court costs.

■ The testator's will granted to the life estates, "the right to use the rents and profits of said lands for their support and maintenance." We do not hold that this language renders the life estate unimpeachable for waste. The life tenants are entitled to cut the timer in accord with prevailing good tree farming practices applicable to the particular tract of land involved. Any material deviation from good tree farming practice would render the life tenants liable to the remaindermen for waste. *See, e. g., Thompson v. Thompson, supra.* The Chancellor's action in directing professional forestry supervision of the tract is appropriate and should forestall any controversy between the life tenants and the remaindermen.

We affirm that portion of the judgments of the lower courts directing the cutting and sale of timber and the continuing supervision thereof until vesting of the fee. We reverse their adjudication with respect to the net proceeds of timber sales, all of which are awarded to the life tenants. This cause is remanded to the Chancery Court of Wayne County for further proceedings consistent with this opinion.

Costs in this Court are adjudged against the life tenants, to be paid from the proceeds of the timber sale.

BROCK, C. J., and COOPER, HENRY and HARBISON, JJ., concur.