IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 8, 1999 Session

## ELIZABETH NICOLL DORAMUS, ET AL. v. ROGERS GROUP, INC., AND T.W. COMER

**Appeal from the Chancery Court for Sumner County**
**No. 97C-120      Tom E. Gray, Chancellor**

———————

No. M1998-00918-COA-R3-CV - Filed February 28, 2001

———————

This appeal involves an intrafamily dispute over the use of a 498 acre farm. The conflict's seeds were sown nearly fifty years ago when the now-deceased owners conveyed the farm to a corporation and entered into a long-term lease which created successive leasehold tenancies for life for them, followed by their son, T. W. Comer. T. W. Comer's heirs at law were given the option to choose to become tenants upon his death. Years later, after T. W. Comer had become the tenant, he and Rogers Group, Inc., a mining company which had purchased the remainder interest in the farm, entered into an agreement involving the removal of limestone from the property. Mr. Comer's daughters and his granddaughters responded by commencing this action, seeking to prevent any mining on the property. After the daughters voluntarily dropped their claims, the trial court dismissed the complaint, and the granddaughters appealed. We affirm the trial court's ruling because we find that the granddaughters' interest is not sufficient to warrant an injunction against the lessor and the current lessee.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed and Remanded.**

PATRICIA J. COTTRELL J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., J., and WILLIAM B. CAIN, J., joined.

James V. Doramus, Nashville, Tennessee for the appellants, Elizabeth Nicoll Doramus and Victoria Lynn Doramus, b/n/f James V. Doramus.

W. Lee Corbett, David F. Lewis, Thor Y. Urness, Nashville, Tennessee, for the appellees, Rogers Group, Inc., and T.W. Comer.

**OPINION**

In 1950, Guy L. Comer and his wife, Mary Nicoll Comer, sold their 498 acre farm to First National Company[1] and entered into a lease with First National as the lessor. The lease identified the successive lessees as (1) Guy Comer, (2) Mary Comer, (3) T. W. Comer and (4) "those persons who on the death of T. W. Comer constitute his heirs at law" if a majority of them accepted the lease. The lease required every successive tenant after Guy Comer to pay the lessor as rent one dollar ($1.00) per month plus all taxes or governmental assessments and premiums for insurance on the principal residence on the property. The lease also required the successive life tenants after Guy Comer to "keep and maintain the [property] in a good state of repair, and keep the land in a good state of cultivation." According to the lease, T. W. Comer additionally possessed "the right to use the property fully as the tenant." With respect to tenants after T.W. Comer, the lease provided:

> On the death of the survivor of Mrs. Guy L. Comer and T.W. Comer, the Fourth Tenant shall be those persons who on the death of T.W. Comer constitute his heirs at law, and the lease shall continue in the name of such persons as joint tenants, until the death of the last survivor. The rent to be paid by such tenants shall be same as in the case of Mrs. Guy L. Comer, that is, One Dollar ($1.00) a month, taxes and insurance on the improvements owned by Lessor.

> ***

> Upon the death of T. W. Comer, and within a period of sixty (60) days thereafter, it is agreed that his heirs at law who are then to become tenants, shall express to Lessor, their consent and intention in writing, to become Lessor [sic] of the Premises, and if a majority of such heirs who are then of age and capable of acting, accept the Lease, it shall continue as to such heirs at law, with a right in the remainder of them, to thereafter at any time become parties to the Lease, or disclaim and forever lose their rights as tenants, but the Lease shall remain valid as to all of those expressing in writing their willingness and desire to continue on as tenants.

Upon the death of "the last of the survivors of the heirs of T.W. Comer," the lease was to terminate and the property was to "re-vest" back in the lessor.

Both Guy and Mary Comer predeceased this litigation, leaving T. W. Comer as the present tenant for his lifetime. In 1995 T. W. Comer entered into a lease and royalty agreement with Rogers Group, Inc. ("RGI") regarding mining rights on the land. At the time, RGI operated a stone mining and processing business on property adjacent to the Comer farm. T. W. Comer, his daughters, Lori Comer Canale and Lisa Lynn Comer Doramus, and Lynn Comer Doramus, acting on behalf of her minor daughters, Appellants Victoria and Nicoll Doramus, all executed the agreement, which set the terms allowing RGI to mine the property. Specifically, the agreement limited the size and

---

[1]The testimony in the record is that First National Company was owned by the Church of Christ Foundation.

location of any open pit operation, but permitted underground mining throughout the property. In conjunction with this agreement, RGI purchased the farm, including the remainder interest, from First National Corporation for $1,250,000 and became the lessor.

After the agreements were executed, Lynn Doramus, acting on her own and her minor daughters' behalf, repudiated the contract. Ms. Canale indicated she would not support the agreement, but would accept its provisions if they were imposed upon her. After the repudiation, RGI and T. W. Comer, as the present tenant, entered into another agreement which permitted RGI to mine the property.

T.W. Comer's daughters and his granddaughters, Appellants, identifying themselves as the "Comer heirs," filed the underlying complaint, seeking to enjoin RGI from all mining on the property. The complaint alleged that as a mere tenant, T. W. Comer lacked authority to allow mining. It asserted claims of waste, breach of the original lease agreement establishing the successive tenancies, intentional inducement to breach the lease, and nuisance. At some point, the daughters voluntarily dismissed their claims. The granddaughters, with their father acting on their behalf, continued to pursue this action against T.W. Comer and RGI, Appellees.

After two hearings, the trial court denied the application for injunction due to a failure to establish irreparable harm, a likelihood of success on the merits, or impairment of the public interest. The trial court dismissed the waste claim on a finding that the lease agreement's provision granting T. W. Comer the right "to use the property fully as the tenant" governed, rather than the common law of waste. In dismissing the breach of contract claim, the court found the lease agreement's stipulation that T. W. Comer had the right to use the property fully as the tenant reflected an intent to allow the mining. The trial court dismissed the inducement to breach of contract claim on the ground that the Appellants had no vested rights giving rise to the claim. It dismissed the nuisance claim because Appellants held no property adjacent to the property at issue. Appellants challenge the trial court's holdings.

I.

Appellees' primary contention is that the granddaughters lack standing to assert the underlying claims because they have no present interest in the property, precluding them from the relief requested. Standing is a judge-made doctrine used to analyze whether individuals possess a sufficient stake in a controversy to warrant the exercise of judicial power on their behalf. *Metropolitan Air Research Testing Auth. v. Metropolitan Gov't of Nashville and Davidson County,* 842 S.W.2d 611, 615 (Tenn. Ct. App. 1992). When a party asserting a claim lacks a legally protectable and tangible interest in the dispute, dismissal is required regardless of the case's merits. *Knierim v. Leatherwood,* 542 S.W.2d 806, 808 (Tenn. 1976). The issue of whether a party possesses an interest in a legal controversy sufficient to maintain an action must be determined, to some extent, by reference to the specific cause of action involved. Nevertheless, that analysis must begin with a determination of the granddaughters' interest in the farm and its use. The Appellants herein, the granddaughters of the current tenant, brought this action on their own behalf as potential heirs to

a life tenancy and as representatives of a class they define as the Fourth Tenant under the lease.

A.

By the specific terms of the lease, the Fourth Tenant's interest in the farm arises only at the death of T. W. Comer and the concomitant termination of his tenancy as Third Tenant. The lease provides that membership in the class of persons eligible to become the Fourth Tenant is to be determined on the death of T. W. Comer: "those persons who **on the death of** T. W. Comer constitute his heirs at law." Thus, the identity of those persons constituting the class of eligible Fourth Tenants cannot be determined until the death of T. W. Comer.[2] Additionally, there will be no Fourth Tenant unless and until a majority of those persons who are adult heirs at law at that time decide to accept the lease.

The lease's use of the term "heirs at law" as the definition of the Fourth Tenant requires the same legal conclusion that members of the class cannot be determined until T.W. Comer's death. The term "heirs at law" means those persons who would inherit if Mr. Comer were to die intestate.[3] *Wright v. Brandon,* 863 S.W.2d 400, 402 (Tenn. 1993); *In Re Estate of Gray,* 729 S.W.2d 668, 670 (Tenn. Ct. App. 1987); *Spencer v. Stanton*, 333 S.W.2d 225, 229 (Tenn. Ct. App. 1959). The legal meaning of the word "heirs" is the class of persons upon whom descent is cast by the statute of descent. *Fisher v. Malermo*, 650 S.W.2d 43, 46 (Tenn. Ct. App. 1983). A living person has no heirs, and the membership of the group "heirs at law" cannot be determined until Mr. Comer's death. *Id.*

The general rule is that a postponed gift to the "issue" or "heirs" of a living person describes a group of persons who cannot be presently ascertained, imposes the condition precedent of survival, and thereby makes the gift contingent. *See* LEWIS M. SIMES AND ALLAN F. SMITH, THE LAW OF FUTURE INTERESTS §§ 579, 732 (1956). Tennessee law is in accord. "A remainder to the heirs of the life tenant is generally a contingent remainder, for, there being no heirs to a living person, until the termination of the life estate, no one can claim as the heir of the life tenant." *Burton v. Kinney*, 191 Tenn. 1, 6, 231 S.W.2d 356, 358 (1950) (quoting 23 R.C.L., Section 95, page 551). Therefore, no individual or group of individuals can presently be identified as the Fourth Tenant under the terms of the lease.

The likelihood of the granddaughters becoming members of the class of persons eligible to become the Fourth Tenant is complicated by an additional contingency created by the Lease's definition of Fourth Tenant by use of the term "heirs at law." As stated above, "heirs at law" are determined by reference to the statute of descent. Tennessee's descent and distribution statutes have

---

[2]Under the lease, T.W. Comer may terminate his tenancy by surrendering it, and the next tenant may exercise the same rights as if T.W. Comer had died.

[3]Although the granddaughters' interest, if any, arises from the lease and not from any inheritance or gift, we may look to those areas of law to determine the intent of the parties to the lease in their use of the term "heirs at law." *See In Re Estate of Gray,* 729 S.W.2d 668, 670 (Tenn. Ct. App. 1987).

-4-

changed since execution of the lease in 1950, but not in a way that affects the granddaughters' interests.[4] All potentially relevant statutes treat successive generations in the same manner. In pertinent part, the statute governing the distribution of land which was in effect when the lease was signed in 1950 provided:

> The land of an intestate owner shall be inherited . . . [b]y all the sons and daughters of the deceased, to be divided among them equally. And if any child of said intestate shall have died in his lifetime, his lineal descendants shall represent their parent, and be entitled to the same portion of the estate of the deceased as their parent would have been entitled to if living.

Tenn. Code Ann. § 31-101(1)(a) (1955) [repealed].

The statute governing distribution of personalty similarly provided that an intestate's personal estate was to pass to the spouse and children "or the descendants of children representing them equally." Tenn. Code Ann. § 31-201 (1955) [repealed]. The current statute provides that the portion of the estate not passing to the surviving spouse passes:

> To the issue of the decedent; if they are all of the same degree of kinship to the decedent they take equally, but if of unequal degree, then those of more remote degree take by representation.

Tenn. Code Ann. § 31-2-104(b)(1).

The term "by representation" refers to the principle by which the issue of a deceased person take or inherit the share of an estate which their immediate ancestor would have taken or inherited if living. *See* BLACK'S LAW DICTIONARY 1301 (6th ed. 1990); *Barnes v. Redmond*, 127 Tenn. 45, 152 S.W. 1035, 1036 (1913). The earlier descent and distribution statutes explicitly embody this principle. The granddaughters of T. W. Comer would, therefore, become his heirs at law, and thus potential members of the class of Fourth Tenant only if their mother predeceases Mr. Comer. While Mr. Comer's children must survive him in order to become his heirs at law, the granddaughters can only become his heirs at law if they survive Mr. Comer but their mother does not.

The granddaughters argue that the lease's use of the phrase "joint tenants" qualifies "heirs at law" and "substitutes a joint tenancy among all living descendants" in place of the "by representation" definition found in the statute. The relevant paragraphs state:

---

[4]Tenn. Code Ann. § 31-2-104 currently provides that an intestate's estate passes to the surviving spouse, if any, and the decedent's issue. Prior law excluded the surviving spouse as an heir at law with regard to land. Tenn. Code Ann. § 31-101 (1955) [repealed]; *In Re Estate of Gray*, 729 S.W.2d at 670. The statute governing personal property included the surviving spouse as a distributee. Tenn. Code Ann. § 31-201 (1955) [repealed]. The question of which statute applies to the definition of "heirs at law" in the lease is not before us and makes no difference to the granddaughters' claims.

. . . the Fourth Tenant shall be those persons who on the death of T. W. Comer constitute his heirs at law and the lease shall continue **in the name of such persons as joint tenants**, until the death of the last survivor.

Whenever and if the **heirs at law** of T.W. Comer become the tenants of the property, it shall be upon the condition that a majority of **such heirs** who are of age and capable of acting, shall have authority to determine how the property shall be used, but they shall allot to each of the tenants, as near as may be, an equal right to use the premises, but such majority may determine which part of the premises is to be used by each, in the event there is no joint user [sic] by all.

There is nothing in the language of these paragraphs to indicate that the parties to the lease intended to modify the earlier specific definition of those persons eligible to become the Fourth Tenant, i.e., "heirs at law" on the death of T.W. Comer.  To the contrary, the paragraphs refer to the "heirs at law" of T.W. Comer, repeating the already established definition, and to "such persons" and "such heirs."  Thus, these paragraphs do nothing to redefine those eligible to become the Fourth Tenant; they merely describe the manner in which those who elect to accept the lease are to share their possessory rights to the property.[5]

Our Supreme Court has rejected an analogous argument that a testator's use of the term *per stirpes* modified the term "heirs at law" so as to eliminate a surviving spouse as a recipient of a testator's estate, where the testator left his residual estate to named individuals, providing that if a named individual predeceased him, "to the heirs at law of such party living at the time of my death, *per stirpes*." *Wright v. Brandon*, 863 S.W.2d at 402. The court held that the term "*per stirpes*" did not serve to identify the beneficiaries; instead it related to the mode of distribution among those who were otherwise identified as beneficiaries. "Further, '*per stirpes*' is not a description of who is to take under the terms of the will, but describes the portion of the share to be allotted to individual members of that class of persons designated by the term 'heirs at law' . . ." *Id.* at 403.  Analogously, in the case at hand, the lease's description of how the members of the Fourth Tenant class will hold the property, as joint tenants, does not modify the lease's description of those persons who are eligible to become members of that class.

The clear language of the lease in this case requires the interpretation that the class of persons eligible to vote to accept the lease, and thus become the Fourth Tenant if a majority votes affirmatively, is limited to those identifiable individuals who on the date of T.W. Comer's death

---

[5]Accordingly, the granddaughters' reliance on *Ewing v. Gibson*, 102 S.E.2d 327 (Va. 1958), is misplaced.  In that case, the court held that a specific direction in a will that all heirs were to take equally or in equal shares required a *per capita* distribution rather than the *per stirpes* (by representation) distribution which would be required under the statute of descent applicable to intestate succession.  The *Gibson* court considered no question regarding the identity of those in the class of heirs (which included persons who were heirs only because their parents had died), but dealt only with the manner of distribution.  The will's reference to the statute of descent was held to mean the method of ascertaining the heirs, while "in equal shares" told how those identified persons should divide the property.  In other words, the beneficiaries of the will took in equal shares because the language of the will so provided.

constitute his heirs at law. Membership in that class is established on that date and does not vary thereafter.

To summarize, in order for the granddaughters to acquire any interest under the lease (1) their mother must predecease T.W. Comer, (2) they must survive T.W. Comer, and (3) a majority of T.W. Comer's heirs at law at his death must vote to accept the lease within sixty days of his death. In order to vote on whether the lease should be accepted by the heirs at law, the granddaughters will also have to reach the age of majority before T.W. Comer's death. Thus, any interest of the granddaughters in the farm is, at this point in time, remote and subject to several contingencies.

B.

More significant than the remoteness of any interest the granddaughters may have, or the contingencies attached to it, is the nature of the interest involved. Even if all the contingencies were removed today, at most the granddaughters would be mere lessees and would have no interest in the remainder or fee.

Any interest which can be claimed by the granddaughters derives from the interests of the class of people eligible to become the Fourth Tenant under the lease, the potential "heirs at law." Any interest that class of persons may have in the farm or its use must be determined by reference to the lease. While the lease's use of the term "heirs at law" to define membership in the class eligible to become the Fourth Tenant requires us to consult the meaning given that term by the legal authority relating to inheritance, it in no way changes the nature of the rights created in the lease.

In their briefs the parties refer to the successive lessees under the lease as "life tenants," but the lease itself never uses that term and refers to the tenants by name, as lessees, or as First, Second, and Third Tenants. It refers to the next potential lessees as "heirs at law" or Fourth Tenant. While the term "life tenants" may not be inaccurate to describe these lessees, the duration of whose possessory interest is measured by their lifetimes, that term is commonly used to describe a person holding a very different type of interest, a part of the ownership or freehold estate. Thus, use of the term "life tenant," without precision in defining the interests involved, creates the possibility of misapplication or confused application of legal principles.[6] To avoid such confusion, we elect not to use the term life tenant, even though used by the parties, to refer to any of the lessees.

Similarly, the parties have described the potential members of the class of Fourth Tenant as holding future interests in the farm. The granddaughters describe that interest as a contingent future interest or contingent future estate (a life estate) and equate their interest to that of a contingent remainderman. RGI also refers to the interest of the heirs at law as "at most, a contingent remainder for life" and as an executory interest, which they define as "a future interest held by a third person

---

[6] For example, the granddaughters' argument regarding their waste claim includes authority which refers to the duties of a tenant in possession compared to the rights of successive life tenants and remaindermen. In that context, the term "life tenant" describes the holder of a life estate, a type of ownership interest in real property.

(not the Grantor) which either cuts short (shifting) or begins at some time after (springing) the natural termination of the preceding estate." [7] Recourse to the distinctions among various types of contingent future interests in land is not necessary, however, to identify the interests presently held by the future Fourth Tenant, potential "heirs at law," or the granddaughters, because no freehold or ownership interests are at stake.

First National Company, RGI's predecessor in interest, owned the real property involved herein. The Lease Agreement clearly defines First National as the Lessor, and defines as Lessees "the individuals hereinafter named, who lease the property for the terms hereinafter set out." First National never conveyed or purported to convey anything more than a leasehold interest to any of the lessees under the lease.

> A lease conveys the possessory interest in property from a landlord to a tenant. Other types of conveyancing - the creation of present freehold estates and future interests - are distinguished from creation of a lease because either they convey something more than the present right to possession or they create interests in the property that never will be possessory. These non-possessory rights include easements, real covenants running with the land, and equitable servitudes.

> Originally the common law distinguished between leases, considered non-freehold estates, and the range of ownership interests called freehold estates. Unlike freehold estates, leases are not the means of transferring ownership in property. **A lease creates possessory rights in the tenant, but nothing more**. Like the creation of leases, the transfer of freehold estates other than future interests - the fee simple absolute, the fee tail, and the life estate - involves the transfer of the owner's rights to possessory rights. In the case of freehold conveyances, however, the grantee receives something more than present possessory rights. The grantor no longer owns the freehold interest conveyed, and the grantee of a freehold estate becomes an owner of the property. As far as the interest being conveyed is concerned, the grantee of a freehold estate replaces the grantor as owner of that particular interest. The grantor may retain certain interests in the property but transfers ownership of the particular interest conveyed to the grantee. Others may share that ownership as co-owners. In contrast, the landlord conveying a leasehold estate to a tenant retains the ownership of the estate, or interest involved, but carves out the present possessory interest for the tenant.

> Freehold estates may also be divided between present and future interests in the property. Although the conveyance of remainder interests and other freehold estates included in the category of future interests does not transfer present possessory rights in the property, the grantee receiving a future interest estate is considered a present

---

[7] RGI does assert, however, that whatever interest the granddaughters may possess is remote, speculative, unvested, and inconsequential.

owner of the property. Thus, the ownership of the property is split between the life tenant, who is entitled to possession of the property, and the remaindermen, whose interests become possessory upon the life tenant's death. **In contrast, the tenant never shares in the ownership of the property.** A lease transfers the owner's present possessory rights but does not make the tenant an owner of the property. **Ownership remains in the landlord, whose present possessory interest in the property is transformed into a future interest estate, a reversion, at the moment the leasehold estate is created.** The landlord continues to have the freehold estate in the property.

*** 

**The possessory rights of a tenant represent a lesser estate than the ownership rights available through the freehold estates - both present possessory and future interest estates. A tenant has the right to possess real property but the property remains the property of another.**

4 THOMPSON ON REAL PROPERTY § 39.04 at 496-97 (Thomas ed. 1994) (emphasis added).

Therefore, potential members of the class of T.W. Comer's "heirs at law" hold no interest, present or future, contingent or otherwise, in the ownership of the farm. They have no interest in the reversion; they are not remaindermen. They are not present holders of contingent future life estates, contingent springing interests, or any other identifiable future interest in the ownership of the farm.

C.

Having determined that the potential "heirs at law" presently hold no freehold interest in the land, we must next determine if they presently hold a leasehold interest.[8] The answer to that question lies in the language of the lease itself and the determination of whether by that language the lessor conveyed a possessory interest to the potential "heirs at law."

The lessor of the real property agreed to lease the farm to a series of successive named tenants, the First, Second and Third Tenants, who all executed the lease. In each instance, the successor tenant automatically became the lessee upon the death of the preceding tenant. No further action was required by the lessor or the successor lessee to bind either to the lease. With regard to the unidentifiable group of T.W. Comer's "heirs at law," the lessor agreed to continue to the bound by the lease only if the majority of that group agreed to become the Fourth Tenant. The Fourth Tenant does not automatically become the lessee upon the death of T.W. Comer. Nothing in this arrangement conveyed any right to the "heirs at law" greater than the right, as a group, to elect to accept the lease and become the Fourth Tenant. That right to elect will ripen into tenancy and the right to possession only if a majority of those eligible to elect choose to accept the lease.

---

[8]Again, without determining that the granddaughters are potential "heirs at law," their interest, if any, derives from that of the members of that class. In other words, their present interest can certainly be no greater than that of the "heirs at law."

Leases have dual nature as a conveyance of an interest in land and as a contract between the landlord and tenant. *See* 4 THOMPSON §39.02(a) at 485. With regard to the conveyance, the tenant ordinarily obtains the present possessory interest in the leased property for the duration of the lease. *See* 4 THOMPSON § 39.01 at 482. The key to the formation and definition of a lease is the conveyance of a possessory interest: "a leasehold, being an estate, gives the right of possession or occupation." ROGER A. CUNNINGHAM ET AL., THE LAW OF PROPERTY § 6.2 at 257 (1984); RESTATEMENT (SECOND) OF PROPERTY: LANDLORD AND TENANT § 1.2 (1977) ("a landlord-tenant relationship exists only if the landlord transfers the right to possession of the leased property"). A lease "grants the lessee . . . control over the property against the lessor and all the world." *Soderholm v. Chicago Nat'l League Ball Club*, 225 Ill. App. 3d 119, 124, 587 N.E.2d 517, 520 (1992). In addition,

> It is well settled that the test for determining what constitutes a lease, as distinguished from other rights or interests, is not necessarily the descriptive language used, but whether it is the manifest intent of the parties that exclusive control and possession of specified space for a specified term has been granted. Thus, it is the transfer of absolute control and possession of property at an agreed rental which differentiates a lease from other arrangements dealing with property.

*Davis v. Dinkins*, 585 N.Y.S.2d 978, 981 (N.Y. Sup. 1992), *modified by Davis v. Dinkins*, 206 A.D.2d 365, 613 N.Y.S.2d 933 (1994).

Obviously, the lessor did not convey any present possessory interest to the potential "heirs at law" of T.W. Comer. That does not end the inquiry, however, because the law also recognizes the validity of leases which are to commence in the future.[9] *See* 1 FRIEDMAN ON LEASES §4.1 at 80 (4th ed. 1997). While a valid lease may exist even though the term of the lease, or possession by the tenant, is to begin *in futuro*, the arrangement must otherwise meet the requirements of a valid lease in order to grant a leasehold. "The law distinguishes between a lease on the one hand and a contract to make a lease on the other. . . . A lease being a conveyance of an interest in land is more than a contract because it creates a leasehold estate in the tenant." 4 THOMPSON § 39.06(a)(2) at 517. A lease must convey a possessory interest in the real property, even if possession is delayed until the occurrence of a future event.

In determining whether the lessor conveyed to the potential "heirs at law" a leasehold estate whose term was to begin in the future, we are guided by the terms of the lease. Like any other written instrument, a lease is subject to the principles of contract construction. *St. Paul Surplus Lines Ins. Co. v. Bishops Gate Ins. Co.*, 725 S.W.2d 948, 951 (Tenn. Ct. App. 1986). In construing

---

[9]One commentator has noted that "leases to commence *in futuro* are unexceptional." CUNNINGHAM § 6.13 at 271. Often, the term of the lease is set to begin upon the occurrence of a specific event, such as the completion of the construction of a new building. *See, e.g., In re Wonderfair Stores, Inc.*, 511 F.2d 1206 (9th Cir. 1975). A writing may be a lease though it does not give a right to immediate possession because a lease for years may create an estate to commence *in futuro*. *See* RESTATEMENT (SECOND) OF PROPERTY: LANDLORD AND TENANT §1.8 ("a landlord-tenant relationship may be made to commence upon the occurrence of an event").

leases and other contracts, the intention of the parties is to be ascertained from the language of the instrument, and such language should be given its usual, natural and ordinary meaning. *Id.* (citing *First American Nat'l Bank v. Chicken System of America, Inc.,* 510 S.W.2d 906, 908 (Tenn. 1974) and *Moore v. Life & Casualty Ins. Co.*, 162 Tenn. 682, 686, 40 S.W.2d 403, 404 (1931)). Contracts are to be interpreted as written, in the absence of fraud or mistake. *Realty Shop, Inc. v. RR Westminster Holding, Inc.*, 7 S.W.3d 581, 597 (Tenn. Ct. App. 1999).

In unambiguous language, especially when compared to the grant to the first three tenants, who were signatories, the lease herein does not convey a leasehold interest to the potential "heirs at law" of T.W. Comer.[10] It merely grants to them the right, if they are adults, to vote to become lessees upon the death of T.W. Comer. Rather than a grant of a leasehold interest, the lease's provisions with regard to even the actual "heirs at law" create in them, at most, a right to elect to receive such an interest.[11]

Therefore, the language of the lease itself compels the conclusion that, with regard to the potential "heirs at law" of T.W. Comer,[12] this was not a lease whose term was to commence in the

---

[10]Potential members of the class of "heirs at law" are not bound to the terms of the lease; they have undertaken no obligations, present or future; they are not signatories; the lease could not be enforced against them.

[11]Were the "heirs at law" parties to the lease, their interest could be characterized as akin to an option to lease or to extend a lease. *See American Oil Co. v. Rasar,* 203 Tenn. 37, 45, 308 S.W.2d 486, 490 (1957) (an option to [extend a] lease is "a unilateral contract whereby the optionor for a valuable consideration grants to the optionee a right to make a contract for purchase (or lease) but this is not binding on the optionee though it is binding on the optionor during the life of the contract").

[12]Under some authorities, the Second and Third Tenants could be said to have been parties to a lease to begin *in futuro* prior to their taking possession or, stated another way, the lease's treatment of the First, Second and Third Tenants could be held to have created, at the execution of the lease, a leasehold interest in all of the first three Tenants, who were also signatories.

> A lease may provide that on the occurrence of some event, the right to the leasehold interest will shift from the original tenant to another tenant. In such case, the occurrence of the event does not terminate the landlord-tenant relationship but changes that relationship to one between the landlord and the successor tenant. When a shift of this type is provided by the terms of the original lease, absent contrary provisions in the lease, when the shift occurs the original tenant is completely removed from future responsibilities under the lease and the successor tenant moves in and becomes an original tenant under the lease from the date of the shift.

RESTATEMENT (SECOND) OF THE LAW OF PROPERTY: LANDLORD AND TENANT §1.7 cmt. g. Other authority however, indicates that the lease's provisions regarding the first three tenants should be considered as three separate but successive leases, each to intervene prior to the lessor regaining possession under its reversionary interest. *See, e.g.*, SIMES & SMITH, LAW OF FUTURE INTERESTS §69. Even if this court were to adopt one of these positions, an issue we need not decide today, the potential "heirs at law" could not rely on that position to enhance their interest because of the specific language of the lease distinguishing the Fourth Tenant.

future.[13]  Accordingly, we find that the potential "heirs at law" of T.W. Comer presently have no leasehold interest in the farm.

## II.

Because the granddaughters have no interest in the remainder, they have no standing to bring an action seeking to enjoin waste on the farm.  Because they presently hold no leasehold or possessory interest, even one to begin in the future, they have no standing to seek to enjoin the mining through a claim of nuisance.

## A.

The granddaughters' first claim is brought to enjoin the mining operations under the theory that such mining constitutes waste, the "technical term of law that describes a use of property by one lawfully in possession of the property, that is detrimental to another's interest in the same property."[14]   8 THOMPSON § 70.03; *see also* WILLIAM H. INMAN, GIBSON'S SUITS IN CHANCERY §589 (7th ed. 1988).

The Tennessee Supreme Court has defined waste as  "an unreasonable or improper use, abuse, mismanagement, or omission of duty touching real estate by one rightfully in possession, which results in its substantial injury." *Chapman Drug Co. v. Chapman*, 207 Tenn. 502, 510, 341 S.W.2d 392, 396  (1960) (quoting *Thayer v. Shorey*, 287 Mass. 76, 191 N.E. 435, 437, 94 A.L.R. 307).  Lasting damage to the remainder or depreciation in its value is a requirement of waste in Tennessee. *Thompson v. Thompson*, 206 Tenn. 202, 214, 332 S.W.2d 221, 227 (1960); *Barber v. Westmoreland*, 601 S.W.2d 712, 716 (Tenn. Ct. App. 1980).

---

[13]The lease also cannot be considered a contract to lease to the potential "heirs at law."  They are not parties to the lease and have not promised to become parties to the lease.  Where parties agree to enter into a landlord-tenant relationship in the future, the document evidencing that agreement is considered a contract to lease, rather than a lease.  "The distinction [between a lease and a contract to make a lease] is important in relation to the issue of remedies available in the case of a breach of the agreement.  If the agreement is characterized as a lease, both contract remedies and remedies available for the protection of possessory interests are applicable. . . . If, in contrast, the agreement is a contract to execute a lease, then no rights of possession have been transferred; in other words, no conveyance has occurred.  The parties merely have the contractual right to enforce the promise to execute a lease."  4 THOMPSON §39.06(a)(2) at 517.  "A contract to make a lease of realty differs from a lease of realty in nature, effects and consequences, much as a contract to sell realty does from a conveyance of realty." *Newport Terminals, Inc. v. Sunset Terminals, Inc.*, 566 P.2d 1181, 1183 (Ore. 1977).  Tennessee courts recognize the validity and enforceability of a contract to enter into a lease at a future date.  "An agreement to lease is not a lease, just as a contract to sell is not a sale.  However, in each case, the owner may be required to perform by a Court of Equity." *Ryan v. Stanger Inv. Co.*, 620 S.W.2d 505, 508 (Tenn. Ct. App. 1981) (citations omitted).  The potential "heirs at law" are not parties to any agreement.

[14]The common law doctrine of waste, developed to protect the owner of a future interest in real property from depredations by the present holder, may have originated as part of Roman jurisprudence, is recognizable in Anglo-Saxon law, and was the subject of statutory revisions throughout the Middle Ages, including mention in Magna Carta. For a full discussion of the development of the law of waste, *see* 8 THOMPSON § 70.07.

Essentially, waste is a violation by the lawful current possessor of the obligation to preserve the value of the land for those with subsequent or remainder interests, *see* 1 RESTATEMENT OF THE LAW OF PROPERTY §138 at 450 (1936), so that "the estate may revert to those having an underlying interest, undeteriorated [by] any willful or negligent act."[15] 93 C.J.S. *Waste* §1 at 560 (1956).

The Restatement examines the principles embodied in the legal concept of waste in the context of the protections accorded a future interest using an analysis based upon the interaction of four variables: (1) the type of the present interest; (2) the type of the future interest for which protection is sought; (3) the exact content of the act or omission as against which protection is desired; and (4) the procedural channel through which protection is demanded. *See* 2 RESTATEMENT OF THE LAW OF PROPERTY 755 (1936).

Actions by the current holder which may constitute waste include changes to the property, changes in use of the land, and changes in the character of the land, but only where the owners of subsequent interests have reasonable grounds for objection to the changes, where the change results in permanent injury to the inheritance, or is contrary to good husbandry.[16] *See* RESTATEMENT OF THE LAW OF PROPERTY §140; 93 C.J.S. *Waste* § 6; 8 THOMPSON §70.08(c)(3). In Tennessee, a change in the land which successive interest holders find merely objectionable would not be considered waste unless that change results in lasting damage to the remainder or depreciation in its value. *Barber*, 601 S.W.2d at 716.[17]

---

[15]These general rights and duties can be expanded or decreased by the language of the document creating the tenancy, e.g., a life estate "without impeachment for waste," "free from all control," or similar language clearly expressing the creator's intent to lessen the duties or increase the rights of the life tenant. *See* 1 RESTATEMENT OF THE LAW OF PROPERTY §141; *see also Merriman v. Moore*, 600 S.W.2d 720, 725 (Tenn. 1980) (court refused to hold that the words "the right to use the rents and profits of said lands for their support and maintenance" rendered the life estate unimpeachable for waste, but held life tenants were entitled to use good farming practices).

[16]In the case at hand, the granddaughters seek protection against the mining or quarrying of limestone. In specific, the current lessee and the holder of the reversion have agreed to a mining operation which will involve the digging of an open pit of approximately twenty-five acres, measuring 1000 feet by 1000 feet, dug to a possible depth of three hundred (300) feet. In addition to the open pit, RGI intends to remove limestone through a system of interlocking subterranean tunnels or caverns throughout the farm, which may also involve air shafts from the surface to the caverns. The mining agreement includes no obligation to reclaim or restore the twenty-five acres after mining ceases. A representative of RGI testified that the company does not normally reclaim quarry property when they stop using it and that the company could not restore the land to the original surface topography and contours.

[17]Tennessee courts have refused to find a life tenant liable for waste where the tenant's changes to the land were consistent with good husbandry, but have clearly stated that actions contrary to good husbandry could subject the life tenant to liability to waste. *Merriman v. Moore*, 600 S.W.2d at 725 (tenant's changes were consistent with good husbandry, which would preserve or enhance the value of the land, and no liability for waste is found, but "[a]ny material deviation from good tree farming practice would render the life tenants liable to the remainderman for waste"); *Thompson*, 206 Tenn. at 214 (timber was cut for purpose of preserving and enhancing the farm generally).

However, it is generally considered waste to open new mines or quarries on the real property and to extract deposits therefrom.[18] 93 C.J.S. *Waste* § 8; 8 THOMPSON § 70.08(c)(2). In most jurisdictions, removal of a nonreplenishable mineral resource may constitute waste since it inevitably involves lasting damage to the remainder or depreciation in the value of the remainder. 51 AM. JUR. 2D *Life Tenants and Remaindermen* §167 (2000).[19] Similarly, a possessor's sale of resources for profit is generally prohibited, unless the sale can be justified as benefitting the real property. *Thompson*, 332 S.W.2d at 226.

Thus, a tenant who begins a mining operation and removes and sells mineral resources would likely be liable to the owner of the land, and could be enjoined by the owner or, potentially, by someone with a future interest in the ownership of the land. However, in the case before us, the owner of the farm, the holder of the reversion, is RGI, the company doing the mining with the consent of the holder of the current possessory interest. The potential "heirs at law" have no intervening ownership interest in the land, as explained earlier. Herein lies the fatal defect in their action to enjoin waste.

Although various remedies are available to a party entitled to bring an action for waste, the most common being damages and injunction, Tenn. Code Ann.§29-36-105, a party's entitlement to a particular remedy depends in large part on that party's interest in the land. The relationship between the parties' interests and the availability of remedies for waste has been summarized: "If the plaintiff in a waste action owns only a reversionary or executory interest in the property, the available remedies vary depending on the remoteness of the possibility that the interest will become a fee simple absolute." 8 THOMPSON §70.09(c).

In this case, while the likelihood of the granddaughters ever becoming members of the class of "heirs at law" and the likelihood of that group electing to become lessees are debatable, the likelihood that any of them will become holders of the reversion or any ownership interest is not. That possibility is not only remote, it is nonexistent.

Tennessee courts have examined the type of interest necessary to bring an action for waste. In *Bowman v. Bowman*, 77 S.W.2d 455 (Tenn. 1935), the Supreme Court held that "it is elementary that complainants must show that they have a present interest in the subject-matter of the litigation, in this case the land, as to which the injunction is sought." *Bowman*, 77 S.W.2d at 455. In that case, creditors of the deceased husband sought to enjoin the widow from cutting trees on land in which

---

[18]These general rules are subject to modification by agreement of the parties showing an intent different from that implied by the common law rule, or by legislation. *See* 8 THOMPSON § 70.08(c)(2).

[19]Most of the Tennessee cases involving removal and sale of resources deal with timber rather than minerals, and the courts have not considered timber a scarce or irreplaceable resource. *See, e.g., Owen v. Hyde*, 14 Tenn. 334 (1834); *see also* footnote 15 herein. In *Barber v. Westmoreland*, however, which involved the removal and sale of fill dirt, this court observed that "the term 'waste' has a very extensive meaning. Specifically, with regard to waste by a cotenant, the term includes the taking away of soil, the quarrying of rock, and the removal of structures or of fixtures attached thereto." *Barber*, 601 S.W.2d at 716 (quoting 20 AM. JUR. 2D *Cotenancy and Joint Ownership* § 38 (1965)).

she held a life estate by virtue of her homestead rights. Finding that the creditors had not subjected the remainder to sale, subject to the homestead, and that they, therefore, had neither title to nor lien on the land, the court concluded, "[a] mere inchoate right to acquire by proper steps a title to or other ownership interest in the land is not sufficient" to establish the interest in land required in a suit to enjoin waste. *Id.*; *see also Nashville, Chattanooga & St. Louis Ry. v. The Railroad and Pub. Utils. Comm'n,* 32 S.W.2d 1043, 1044 (Tenn. 1930) (action dismissed because plaintiff was seeking to protect an "alleged right," one which could only be established in two related lawsuits, a situation analogous to dismissal of a suit to prevent waste, which can only be maintained by a plaintiff with "a clear title").

Obviously, an injunction to prevent waste is designed to protect the interest of the holder of the remainder or reversion in land so that it is not devalued by the current possessor. Waste is actionable only where the action of the present holder results in lasting damage to the remainder or depreciation in its value. *Thompson*, 332 S.W.2d at 227 ("only that which does a lasting damage to the remainder, or depreciates its value, is waste"); *Barber*, 601 S.W.2d at 716; *Priest v. Priest*, 621 S.W.2d 577, 578 (Tenn. Ct. App. 1981) ("A remainderman unquestionably is entitled to relief from threatened waste which impinges upon or impairs his remainder interest"). Thus, a party seeking to enjoin a particular use of land as waste must have a sufficient stake in the value of the ownership interest to warrant judicial interference to protect that value. While that interest might be a future interest or might be contingent, it must be an ownership interest.[20]

B.

Appellants also lack standing to assert their nuisance claim. "A nuisance is anything which annoys or disturbs the free use of one's property or which renders its ordinary use or physical occupation uncomfortable." *Aldridge v. Morgan*, 912 S.W.2d 151, 154 (Tenn. Ct. App. 1995) (quoting *Wilson v. Farmers Chemical Ass'n, Inc.*, 60 Tenn. App. 102, 444 S.W.2d 185 (1969)). "A private nuisance involves interference with a person's use and enjoyment of land." *Wayne County v. Tennessee Solid Waste Disposal Control Bd.*, 756 S.W.2d 274, 283 (Tenn. Ct. App. 1988). These well-established definitions presuppose a present interest in property affected by the nuisance. *See Hadden v. City of Gatlinburg*, 746 S.W.2d 687, 689-90 (Tenn. 1988) (as between landlord and current tenant, the right to maintain a nuisance action depends upon which estate suffers harm from the wrongful act.) Appellants do not possess such an interest.

---

[20]In *Giles v. Third Nat'l Bank*, 1985 Tenn. App. Lexis 3092 (Tenn. Ct. App. Aug. 16, 1985) (no Tenn. R. App. P. 11 application filed), this court held that non-income receiving, solely contingent beneficiaries to a trust had no standing to bring an action against the trustee for failure to produce a larger income because they had no right to the income. The court stated, "We do not mean to intimate that contingent beneficiaries have no standing in any case to use [sic] a trustee. It has long been the law of this state that those who hold only contingent or remainderman interests in a **res** have the right to bring an action to prevent waste of the property." (citing *Miller v. Speed*, 56 Tenn. 196, 199 (1872) and *Priest v. Priest*, 621 S.W.2d at 578).

III.

The granddaughters also assert that the mining violates their express and implied contract rights. Specifically, they point to the lease's provision requiring lessees to "keep and maintain the same[21] in a good state of repair and keep the land in a good state of cultivation." They argue that the lease's grant specifically to T.W. Comer, and only to T.W. Comer, of "the right to use the property fully as tenant" does not vitiate his obligation to preserve the premises. T.W. Comer, they assert, is bound deliver the farm in a condition they characterize as "its pristine form" to the Fourth Tenant at the end of his tenancy.

In addition to being a conveyance of an interest in real property, a lease is also a contract between the parties. *Williams v. Starce*, No. 85-162-II, 1985 WL 4074 at *1 (Tenn. Ct. App. 1985) (no Tenn. R. App. 11 application filed). Thus, although we have found that the potential "heirs at law" presently hold no leasehold interest in the farm, we must consider the granddaughters' contention that they can enforce contractual rights created in the lease.

We begin with the fact that neither the granddaughters nor any other potential "heir at law" of T.W. Comer is a party to the lease, although the First, Second and Third Tenants are. The granddaughters assert that the Fourth Tenants are the express beneficiaries of the lease, and that they have been granted the "express contractual right to the complete use and enjoyment of the entire five hundred acres." Setting aside the issue of whether the granddaughters can assert the rights of the Fourth Tenant, we must determine whether the potential "heirs at law" of T.W. Comer are intended beneficiaries of the maintenance provisions of the lease and are entitled to enforce those specific provisions.

As a general rule, only parties to a contract are entitled to sue to enforce its provisions, and it is presumed that the contract has been entered into for the benefit of those parties. However, the law recognizes an exception to that general rule where a person who is not a party to the contract can show that the parties intended that he benefit from the contract. *First Tenn. Bank Nat'l Ass'n v. Thoroughbred Motor Cars, Inc.*, 932 S.W.2d 928, 930 (Tenn. Ct. App. 1996); *Moore Constr. Co. v. Clarksville Dep't of Elec.*, 707 S.W.2d 1, 8 (Tenn. Ct. App. 1985). A nonparty asserting the status of intended beneficiary of a contract must meet the following burden:

> Since the law presumes that a contract has been executed for the benefit of the parties thereto, a person claiming to be an intended beneficiary has the burden of proving from the terms of the contract itself or the circumstances surrounding the contract's execution that he is entitled to recover. Each case must be decided on its unique facts considered in light of the specific contractual agreements and the circumstances under which they were made.

*First Tenn. Bank*, 932 S.W.2d at 930 (quoting *Moore Constr.*, 707 S.W.2d at 9-10).

---

[21]The phrase "the same" appears to refer to the principal residence on the farm.

The record includes no testimony regarding the circumstances surrounding the drafting of execution of the lease, except the fact that the original lessor, First National Company, was owned by the Church of Christ Foundation. Therefore, any evidence of an intent to benefit persons other than the parties must be found in the language of the specific agreement.

> A person is a donee beneficiary[22] when it appears from the terms of the promise in view of the accompanying circumstances that the purpose of the promisee in obtaining the promise of all or part of the performance thereof is to make a gift to the beneficiary or to confer upon him a right against the promisor to some performance neither due nor supposed or asserted to be due from the promisee to the beneficiary.

13 WILLISTON ON CONTRACTS §37:9 at 82 (2000) (citations omitted).

We can find no intent in the maintenance provision of the lease that that promise was made to benefit the potential members of a class who will become eligible to vote to exercise the option. Instead, those provisions are directly related to the relationship between the lessor and the signatory lessees and for the benefit of the lessor and the actual lessees.

When Guy Comer first transferred the farm to the lessor, he specifically reserved to himself all buildings on the property except the principal residence which was transferred to the lessor. The lease recognizes the First Tenant's (Guy Comer's) reservation of these structures as his personal property and his reservation of the right to remove those and other improvements as he saw fit during his lifetime. Guy Comer was also given the right to build and sell other buildings on the property during his tenancy. As the First Tenant, Guy Comer agreed to pay $750 per month in rent, but the lessor agreed to pay all taxes or other governmental assessments, to maintain the principal residence in good and substantial repair, to insure the residence, and to restore the residence if it were damaged or destroyed, subject to Guy Comer's approval of the plans.

Under the lease, the Second Tenant, Mary Comer, was to "hold as Lessee for and during the remainder of her natural life." She was to pay "as rental" one dollar ($1.00) per month and all taxes or other governmental assessments on the property. In addition, she was obligated to pay for insurance on the residence, but the insurance was to be carried in the lessor's name, "and generally, she shall relieve Lessor from any and all payments in reference to said property, and keep and maintain the same in a good state of repair, and keep the land in a good state of cultivation."

During Mrs. Comer's tenancy, she was to allow her son, Mr. T.W. Comer, to live in a specific house on the property without charge or to erect a new dwelling house at his expense. As the Third Tenant, T.W. Comer was subject to the same terms and conditions as those applicable to

---

[22]Although no longer a necessary distinction, a donee beneficiary's interest arose from a presumed gift while a creditor beneficiary's interest arose from discharge of a duty owed the beneficiary by the promisee. See 13 WILLISTON ON CONTRACTS § 37:7 at 35-37 (2000). Both were classes of intended beneficiaries. *See id*. at 33. Since the granddaughters do not claim that the original lessees or lessor owed them a duty, their claim arises from a gift.

the Second Tenant, except that T.W. Comer was specifically given the additional "right to use said property fully as the tenant."

The Fourth Tenant (those adult heirs at law of T.W. Comer at his death who accept the lease) was to be responsible for rent, taxes, assessments, and insurance on the same terms as the preceding tenants, including the following:

> On the event the main dwelling on the premises is destroyed after the death of Guy L. Comer, and at a time when insurance is maintained by the tenant, the then tenant of the premises shall restore the main dwelling out of insurance money, to as near as may be the condition it was in at the time of the damage or destruction. The Lessor shall have the right to inspect and approve the plans for any such restoration.

The lease also includes the following forfeiture provisions:

> The Lessor shall have no right to declare a forfeiture of this lease against the first three named tenants, Guy L. Comer, Mrs. Guy L. Comer, and T. W. Comer but in the event Mrs. Guy L. Comer or T.W. Comer, or either of them, fail or refuse to pay any amount which may be due for taxes, insurance or other expenditures contracted to be made by them, the Lessor may make such expenditures, including repairs to the premises and the reasonable cost thereof, or the amount of taxes or insurance, together with interest from the date of advancement shall be a debt of the then tenant, immediately payable, and may be collectible in any Court of Competent jurisdiction.

> If after the death of T. W. Comer, the then tenant or tenants fail or refuse to pay taxes, insurance, or make repairs after 30 days' notice by Lessor so to do, the Lessor may, without further notice, cancel and terminate this lease and re-enter possession of said premises, without the premises being in any way encumbered by this lease.

The granddaughters would have us find that the obligation to maintain the premises is intended to benefit potential future lessees. We think it is more likely, however, that that obligation is merely part of the mutual rights and obligations between the lessor and actual lessees, during the term of a tenancy. Provisions regarding the duty to maintain premises in good condition are common in leases. *See, e.g., Jaffe v. Bolton,* 817 S.W.2d 19, 24 (Tenn. Ct. App. 1991) (detailed provisions were included regarding condition of premises when leased, improvements to be made, and tenant's promise to keep the premises in good repair and condition); *Hooten v. Nacarato GMC Truck, Inc.*, 772 S.W.2d 41, 47 (Tenn. Ct. App. 1989) (tenant agreed to keep the leased premises in good repair and landlord could enforce that promise, even though the facts did not support forfeiture of the tenancy). A tenant's promise to make repairs is enforceable by the landlord, who is entitled to damages. *See* FRIEDMAN ON LEASES § 10.602(a). Common also are agreements regarding insurance. *See Bishops Gate*, 725 S.W.2d at 952 (insurance proceeds may be allocated between the parties depending on the terms of the lease and the nature of the loss). An agreement to purchase insurance on leased premises is presumed to be for the mutual benefit of the lessor and lessee. *Tate*

*v. Trialco Scrap, Inc.*, 745 F. Supp. 458, 473 (M.D. Tenn. 1989), *aff'd* 908 F.2d 974 (6th Cir. 1990) (unpublished disposition).

Where the tenant promises to keep premises in a good state of repair, that promise is for the benefit of the lessor. The lessor, as holder of the reversion, is benefitted by the provisions which require maintenance and insurance of the premises, so that the value of its ownership interest is not injured. The Fourth Tenant's obligations to maintain the premises and keep it insured indicates that the provisions are intended to benefit the lessor. The fact that the Fourth Tenant may forfeit its tenancy for failure to meet these requirements leads even more forcefully to that conclusion. The granddaughters have failed to meet their burden of demonstrating that the parties intended that they benefit from the promise of lessee to maintain the premises in good repair and the land in a good state of cultivation.

Although the granddaughters hold no leasehold interest, are not parties to the lease, and are not obligated by contract to become lessees in the future, they in essence seek to enforce prospectively a covenant somewhat like a covenant of quiet enjoyment, or habitability, or fitness of the premises for the lessee's purpose. *See* THOMPSON §§ 40.01 - 40.24 (explanation of duties of landlord and tenant). Since they are, at most, merely potential lessees, they have no standing to attempt to impose or enforce such a covenant.

When deciding whether to undertake the obligations of a lease, a potential lessee is generally expected to inspect the premises to be leased and to weigh the benefits and the obligations of the lease arrangement. *See* FRIEDMAN ON LEASES §§10.101 and 27.4. "The traditional common law view was that the landlord made no implied warranty in connection with this conveyance [the lease] regarding the initial condition of the leased property or of its fitness for the tenant's intended purposes." THOMPSON § 40.23(a)(1); *see also Parris v. Sinclair Refining Co.*, 359 F.2d 612, 614 (6th Cir. 1966) (under Tennessee law, a tenant takes property as he finds it). The provisions of the lease in question contemplate that the "heirs at law," when they become such, may determine whether to undertake the financial and other obligations of lessees. Part of that analysis would naturally include assessment of the condition of the farm and its suitability to their purpose at that time. We decline to presume that the original parties to the lease intended that unknown persons who might become eligible to decide whether to become lessees were to be guaranteed the right to refuse the lease of the farm in its pristine condition.

The fact that the granddaughters have only a contingent, and arguably remote, possibility of becoming lessees clearly points out the weakness of their position. In essence, they would have us hold that potential future lessees are intended beneficiaries of a lease's obligations to maintain the premises, even where there is no lease to begin in the future, there is no contract to lease, and they are not parties to an option to lease. We find no authority for this position and decline to create any.

IV.

We need not determine whether the "heirs at law" or the potential "heirs at law" are intended beneficiaries of any other promise in the lease since they do not seek to enforce any other provision. When determining third party beneficiary status, courts examine the specific promise which the third parties contend was intended to benefit them. For example, in *Disney Bros. v. Campbell County*, 6 Tenn. App. 569 (1926), this court found that the promise of the contractor to hold the county harmless for debts for materials furnished in construction of a road constituted an express undertaking to pay those debts, and, being a promise made for the benefit of suppliers, created a direct liability of the contractor to suppliers, allowing their suit for cost of supplies. *Disney Bros.*, 6 Tenn. App. at 579. That finding, of course, did not mean that the suppliers were third party beneficiaries of other provisions of the contract between the county and the contractor to build the road. "[T]he beneficiary, though not a party to the contract, may maintain an action directly in his own name against the promisor, where such promise between the promisor and the promisee is made upon consideration for the benefit of the third party." *Id.* Similarly, in *Owner-Operator Independent Drivers Ass'n, Inc. v. Concord EFS, Inc.*, No. M1999-02560-COA-R3-CV, 2000 WL 225945 (Tenn. Ct. App. Feb. 29, 2000) (perm. app. granted Sept. 11, 2000) this court determined that truckdriver holders of credit cards were intended, at least by one of the parties, to benefit from a provision in the contract between the merchant bank and merchants in which the merchants promised not to add surcharges to purchases made using that credit card. *See Concord EFS*, 2000 WL 225945. The fact that this court found the cardholders to be third party beneficiaries of that promise in the contract cannot be interpreted as giving them standing to enforce other provisions of the commercial contract between the bank issuing the cards and the merchants.

Therefore, we decline to address the question that would be presented if the actual "heirs at law," the majority having decided to become lessees, were seeking to enforce the promise of the lessor to keep the lease in effect as to the Fourth Tenant.

V.

We conclude that the granddaughters' have shown no interest in how the farm is used that would give them sufficient stake in the issue to warrant an injunction prohibiting the mining which has been agreed to by the lessor, who is the holder of the reversion interest, and the current lessee who "may use the property fully" during his tenancy. Therefore, we affirm the judgment of the trial court. Costs are taxed to the Appellants.

_____
PATRICIA J. COTTRELL, JUDGE